**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff,**

v.

**Robert S. PRANN, Evelyn Prann, and the conjugal partnership established by them; Bracero & Rivera, Inc.; and Development & Investment Corp., Defendants.**

**Civ. No. 85–0282CC.**

United States District Court, D. Puerto Rico.

Sept. 1, 1988.

As Amended Sept. 7, 1988.

Gabriel Hernández–Rivera, Feldstein, Gelpí, Hernández & Gotay, Old San Juan, P.R., for plaintiff.

Robert S. Prann, San Juan, P.R., pro se.

José E. Rivera–Reyes, Hato Rey, P.R., for Bracero & Rivera.

Carlos A. Quilichini, Old San Juan, P.R., for Development & Inv.

## AMENDED OPINION AND ORDER

CEREZO, District Judge.

This is an action for foreclosure of mortgage and collection of monies allegedly owed pursuant to certain promissory notes acquired by the Federal Deposit Insurance Corporation (FDIC), in its corporate capacity, from a failed financial institution, Girod Trust Company (Girod), through the FDIC as receiver. The notes resulted mainly from several loan and pledge transactions between Girod and the two primary defendants, Development and Investment Corp. (Development) and Bracero and Rivera, Inc. (Bracero). These transactions all relate to the construction of a housing project in Arecibo, Puerto Rico, known as "Las Brisas de Arecibo." The project was initiated by Bracero in 1981 but was continued by Development, after it purchased the land from Bracero in 1984. Federal jurisdiction is premised on 12 U.S.C. Section 1819 and 28 U.S.C. Section 1345.

Of the five-count amended complaint instituted by FDIC, the only matter[1] presently before the Court is the first claim in Count IV, to wit, the liability, if any, of Bracero on a mortgage note it issued which Development pledged to Girod. The FDIC alleges that it holds a $2,000,000 bearer mortgage note on the Arecibo property, executed and pledged by Bracero to Girod as security for several construction loans regarding the Arecibo project. It appears that the same note was later pledged by Development, after it acquired the land from Bracero, as security for additional construction loans needed to complete the Arecibo project. Even though it is undisputed that Development purchased the land in May 1984, to this date Bracero has re-mained the owner and mortgagor of record in the Registry of Property of Puerto Rico.

FDIC alleges that Bracero is in default on the note which is payable on demand. Bracero, in turn, contends that it is not liable on the note because Development assumed its (Bracero's) debt on the promissory note and corresponding mortgage upon purchasing the land, all with the tacit, if not express, consent of Girod, the original creditor.

Thus, the broad issue before us is whether or not in 1984 when Bracero sold the Arecibo project to Development, its liability on the mortgage note was discharged by Development's assumption of Bracero's debt under the consenting eye of Girod.

This matter was heard before the Court and memoranda were subsequently filed. As will be seen from the discussion to follow, what should have otherwise been a standard collection proceeding has become a procedural and factual nightmare, due in large part to Girod's careless and unorthodox handling of the loan transactions at issue.

Count I of the amended complaint sought to recover from Development over $1,600,000 in principal and interest from several bearer promissory notes made by Development pursuant to loan and pledge agreement with Girod. In September 1986, in an extensive opinion and order, the Court adjudicated this count in favor of FDIC (docket number 92) and on March 23, 1987 it entered partial judgment against Development for $2,000,000 in principal and interest and $161,000 in attorney's fees.

Count II sought to collect on a $55,000 promissory note made by Development to Girod. Again, in an Opinion and Order of September 1986 and the corresponding Judgment of March 1987, the Court held in favor of FDIC in the sum of $65,000 for principal and interest and $5,000 in attorney's fees.

Count III sought the imposition of *in solido* liability against defendants Rivera–

---

1. The rest of the counts as well as the other claim asserted in Count IV itself were either dismissed or stayed by the Court.

Arroyo, Myrna Landrón–Náter and the conjugal partnership composed by them regarding a continuing letter of guaranty issued in 1977 and executed by them to secure certain loans Girod issued to Bracero. In an Opinion and Order of September 15, 1986, 645 F.Supp. 511, the Court found that the letter of guaranty corresponded to another construction project wholly unrelated to the Arecibo project. Accordingly, the claim against these defendants was dismissed.

In Count IV the FDIC sought to collect on the $2,000,000 bearer note executed by Bracero and now held by FDIC. That note was originally pledged to Girod by Bracero and later by Development pursuant to their respective loan and pledge agreements with Girod.

In a summary judgment motion, Bracero sought dismissal of the Count IV collection on its mortgage note on the grounds of assumption of debt and actual discharge of the note. The Court denied this motion because it found that Bracero had failed to show that there was no triable issue of fact on whether Girod implicitly consented to have Development assume Bracero's debt and thereby release Bracero from any pre-May 1984 debt incurred in the Arecibo project. *See:* Opinion and Order of September 15, 1986.

Finally, in Count V, the FDIC asserted that defendants Robert S. Prann, his wife, and their conjugal society were alter egos of Development and were thus liable for Development's $3,600,000 construction loan negotiated and executed by Mr. Prann at a time when the corporation had not yet been registered and for which there existed a promissory note for approximately $1,400,000 and another one for $55,000,000. The claims asserted under Count V were stayed on August 25, 1987, pursuant to 11 U.S.C. Section 362 pending bankruptcy proceedings.

After careful consideration of the record and the evidence adduced by the parties, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On December 14, 1981, Bracero purchased from the Federal Deposit Insurance Corporation a property in Arecibo for the price of $480,000.00 as per Deed No. 14 executed at San Juan, Puerto Rico before Notary Public Jorge L. Mendía which is described as a parcel of land located at Hato Abajo Ward of the Municipality of Arecibo, property 11109, recorded at page 38, volume 230 of the Registry of Property of Puerto Rico, Arecibo I Section. A certain housing project known as Las Brisas de Arecibo was developed and numerous lots were segregated.

2. On December 14, 1981, Bracero and Girod entered into a Loan and Pledge Agreement whereby Girod lent Bracero $950,000.00 for that construction project on its Arecibo property and Bracero, in turn, executed and delivered to Girod a promissory note payable on demand to bearer in the amount of $950,000.00 plus 15% interest per annum.

3. The promissory note was secured by a duly registered first mortgage of $950,000.00 upon the real property referred to above. Mortgage Deed No. 213 executed by Bracero before Enrique N. Vela Colón and dated December 14, 1981 describes, at paragraph 27, the mortgaged property referred to as follows:

"RUSTICA: Radicada en el barrio Hato Abajo del término municipal de Arecibo, con una cabida de veintiuna cuerdas con treinta y tres céntimos de otra, equivalentes a ocho hectáreas, treintiocho áreas, veintisés centiáreas, en lindes por el Norte, con un camino vecinal y tierras de Juan Cruz López; por el Sur, con terrenos de Luis Delgado; el Este, con tierras de Gregorio García García; y por el Oeste, con tierras de Juan Pérez, camino por el medio y tierras de Secundino Olmo."

4. On March 31, 1983 the $950,000.00 mortgage note was increased or extended to the principal amount of $2,000,000.00 by virtue of Deed No. 10 executed by Bracero in favor of Girod Trust Co. before Enrique Vela Colón, dated March 31, 1983. This

deed appears recorded in the Registry of Property of Puerto Rico.

5. On April 13, 1984 Bracero sold the mortgaged property to Development for the price of $1,316,046.97, which, at the time, was the outstanding debt secured by the mortgage in favor of Girod. Pursuant to the terms of the purchase deed, instead of paying Bracero directly, Development retained the purchase price and expressly agreed to use the money to cancel Bracero's debt with Girod.[2] Development also agreed to continue with the Arecibo construction project.

6. This purchase deed and the corresponding change of ownership of the Arecibo land was never recorded in the Registry of Property of Puerto Rico. Thus, as of the date of this Order, Bracero still appears as the owner of *record* in the Registry of Property, Arecibo I Section.

7. Girod did not participate in the sale transaction between Bracero and Development. The purchase deed, consequently, does not expressly reflect Girod's consent, or lack thereof, to Development assuming Bracero's mortgage debt.

8. On May 18, 1984 Girod entered into a Loan and Pledge Agreement with Development whereby Development was immediately granted a $1,650,000.00 line of credit to complete the Arecibo project known as Las Brisas. *See:* Plaintiff's Exhibit 5 at p. 5.

9. As security for that loan, Development "delivered" and pledged Bracero's mortgage note of $2,000,000.00 to Girod even though the note, admittedly bearer paper, was presumably still in Girod's possession as a result of its transactions with Bracero in 1981 and 1983.

10. At no time was a mortgage over the Arecibo land constituted in Development's name in the Registry of Property of Puerto Rico.

11. Both Bracero's and Development's Loan and Pledge Agreements with Girod were executed before Notary Public Vela Colón and both contain the identical pledge statement which reads as follows:

As security for the punctual payment of all obligations hereunder as well as the punctual performance of all conditions, covenants and undertakings of the BORROWER under this Agreement, the BORROWER hereby delivers and pledges to the LENDER that certain Mortgage Note of the BORROWER, dated December 14, 1981, in the amount of $950,000.00 secured by a FIRST Mortgage over the Real Property created pursuant to Deed No. 213 dated December 14, 1981, executed before Notary Public Enrique N. Vela Colón, as modified to $2,000,000.00 by virtue of Public Deed number 10, executed in San Juan, Puerto Rico, on the 31st day of March, 1983, before Notary Public ENRIQUE N. VELA COLON.

12. The minutes of a meeting of the Construction Committee of Girod held on an unspecified date state as follows:

8—CONSTRUCTION COMMITTEE

b—Mr. José E. Vela presents a motion to accept the new debtor Development and Investment Corporation for the construction loan of the Las Brisas de Arecibo development and reduce the line of credit for said project to $1,650,000.00. After the motion was seconded by Mr. Aníbal L. Arsuaga, Jr., it was unanimously approved as follows:

TO DETERMINE: Accepting the new debtor Development and Investment Corporation for the Las Brisas de Arecibo project and to reduce the line of credit for the construction of said project to the amount of $1,650,000.00.[3]

---

**2.** *See:* Deed No. 17 dated April 13, 1984 executed by Bracero, as seller, and Development, as buyer, before Notary Public Enrique Vela Colón. Clause 1 of the Clauses and Conditions set forth in Deed No. 17 (presented by FDIC as exhibit 3 to its opposition of September 13, 1985 to Bracero's motion for summary judgment) provides in its pertinent part that the seller (Bracero) did not receive any cash payment before or during the execution of the deed and that the buyer (Development) retained the total amount of the price to pay off in due time the mortgage which at the time encumbered Bracero's property at Arecibo.

**3.** Defendant Bracero's Exhibit II attached to Motion in Opposition to Plaintiff's Motion for Reconsideration. *See* docket entry 102. *See also*

13. There is no evidence of fraud by Development in the execution of its Loan and Pledge Agreement.[4]

14. At present, Bracero has no control over the construction project and encumbered real estate.[5]

15. There are no common officers and directors between Bracero and Development.[6]

16. Bracero was not a party to the Loan and Pledge Agreement between Development and Girod.[7]

17. Of the $1,650,000.00 initial loan Girod made to Development pursuant to their Loan and Pledge Agreement, Development, on May 22, 1984, withdrew $1,399,523.18 from that loan account (No. 25–85–00099–5) for which Development immediately executed a promissory note, in the same amount, payable to Girod on demand. Plaintiff's Exhibits 9, 10, and 12. This withdrawal was made pursuant to a document entitled "Certification No. 1" dated May 21, 1984 and signed by Development and Girod. Plaintiff's Exhibit 9.

18. Certification No. 1, like other certifications found in the record, is a document whereby Development would present and Girod would approve the cost distribution for each outlay of the construction loan. In other words, each time Development wanted to use a portion of the credit line established by Girod, it would have to submit an expense sheet detailing how the money would be disbursed. In Certification No. 1 the first cost item was to pay a "bank balance" of $1,298,206.33. The other ten cost items detailed in Certification No. 1, which amounted to $101,316.85, were for various project expenses such as "insurance and permits," "promotion and sales" and "interest reserve." Plaintiff's Exhibit 9, p. 2.

docket entry 126 (defendants' Post–Trial Brief). This document has not been controverted by plaintiff.

4. Uncontested fact No. 7, set forth in the Pretrial Order filed on November 4, 1986, docket entry 103.

5. Uncontested fact No. 9 in the Pretrial Order.

19. The "bank balance" referred to in Certification No. 1 was the amount that *Bracero* owed Girod on the construction loan of the Arecibo project (the mortgage note) which Development was, by way of the Certification and subsequent disbursement, paying in full pursuant to its Sale Agreement with Bracero by virtue of Deed No. 17 of May 13, 1984. *See:* Plaintiff's Exhibit 11.

20. On May 22, 1984, Girod issued credit voucher No. 103348 in favor of *Bracero* for the amount of $1,298,206.33, the amount of the "bank balance" entry in Certification No. 1. The description of the credit voucher reads in Spanish as follows: "Saldo de préstamo de Bracero y Rivera 25–85–70–9," which we translate as "cancellation of Bracero and Rivera's loan 25–85–70–9." Plaintiff's Exhibit 11.

21. On that same date, Girod issued a "credit advice" slip to Development in the amount of $101,316.85, the aggregate amount of the other ten cost items accounted in Certification No. 1, with the following "reason" "Se le está acreditando a la cuenta corriente la Certificación Núm. 1 Las Brisas," which we translate as "we are crediting to your checking account the Certification No. 1 Las Brisas." Plaintiff's Exhibit 11.

## CONCLUSIONS OF LAW

Before fully discussing the main issues of this case, we must first consider the business relationships between the parties, i.e., the way they operated and the possible motivations [8] behind the transactions they conducted which are at issue here. Within this context we must analyze the pledge contract between Development and Girod and other related, albeit not necessarily dispositive, issues raised by the parties.

6. Uncontested fact No. 10 in the Pretrial Order.

7. Uncontested fact No. 11 of the Pretrial Order.

8. As will be discussed thoroughly below, the intention of the creditor is an important factor in the assumption-of-debt analysis.

·FDIC argues that since Bracero's mortgage note was pledged to Girod as security for Development's loans and since Development has been adjudged in default on the same, then it is entitled to judgment against Bracero, as maker of the facially valid promissory note, as well as to the execution of the mortgage and to any deficiency between the land sale price and the amount of the note.

 Bracero contends it is not liable to FDIC for Development's debt with Girod because when Development took over the Arecibo project it assumed Bracero's entire debt and thereafter obtained further and independent financing from Girod for that project. Bracero argues that Girod subsequently released it of its liability on their original construction loans as well as the corresponding promissory note and mortgage. In any event, it claims that the balance remaining on the $2,000,000.00 promissory note was paid off by Development four days after it assumed the debt. Although FDIC admits, as it must, that $1,298,206.33 of the monies loaned by Girod to Development "was used to pay Girod the balance owed to the bank by Bracero at that time,"[9] it would have the Court ignore the payment because it was not made in cash. It argues in its post-trial brief (docket entry 123) that "the evidence shows that no cash was received by Girod in settlement of the $1,298,206.33 indebtedness of Bracero; it was *merely a paper or book entry in Girod's books."* (Emphasis ours.) In this day and age of computerized banking technology we find this argument to be specious. The fact that Development acted independently of Bracero in its transactions with Girod was established in our Order of September 1986 where we concluded that

there was no *in solido* liability between Development and Bracero because they were not joint venturers and, consequently, did not engage in a joint debtorship. It can reasonably be inferred from the evidence that Bracero, in good faith, neglected to retrieve its note or to pursue the proper Registry of Property changes regarding the mortgage, relying on the fact that its obligation with Girod had been extinguished.[10] Although such neglect is certainly a bad business practice—as the cost of this litigation alone can certainly attest—given the evidence presented, it amounts to nothing more than that.

Essentially, the Loan and Pledge Agreement between the parties (i.e., involving either Development or Bracero as borrowers since the overall procedure vis-á-vis Girod was the same with both) was a master plan containing the broad parameters of their mutual obligations. As part of that plan, the parties would conceive in general terms the schedule for the construction of the project, the series of disbursements to be given and the repayment of the same. The Agreement, in the normal course of business, would thus be subdivided into several discrete loans or "credit lines." Cash would be drawn from these credit lines only through "certifications," i.e., official borrower requests for particularized disbursements with express bank approval of the same. For each certification and disbursement, a concomitant promissory note would be issued by the borrower usually in the name of Girod and for a one-year term. Importantly, repayments of the loan would generally be made through the actual sale of housing units. Therefore, it was in the interest of all con-

---

**9.** Plaintiff's Post–Trial Brief, at p. 6, docket entry 103.

**10.** Bracero posits an interesting theory regarding the way its note ended as security for Development's loans. It argues that Girod and Development, in order to save Development closing and registration fees, which would easily amount to tens of thousands of dollars, decided not to transfer the ownership of the land to Development in the Registry of Property or to cancel Bracero's mortgage and have Development institute a new one. Rather, Girod decid-

ed to take a limited risk, feeling that the project was nearing a successful closure, by simply retaining the mortgage note it already had on the same land, and issuing a new loan, in the exact amount, to Development such that Bracero's balance could be paid off and Development would still appear as having provided security for the new loans it was receiving from Girod, albeit a security that was technically non-existent since Bracero's obligation was being extinguished with the first disbursement.

cerned that the houses be built and sold as quickly as possible.

In the present case, it seems fairly clear that any substantial monies to be gained by the parties, especially Girod, would come only from the successful completion of the project whereby units could be sold and the mortgage paid. Apparently Bracero became unable or unwilling to do exactly that, i.e., finish the project. It did, however, provide Girod with a more palatable and viable alternative to foreclosure: In exchange for the freedom of walking away from the project and its construction loan liabilities, Bracero would offer a new debtor, a fresh face willing to finish the project and to take over the then existing debt.

The above scenario also sheds some light on some of the more knotty, albeit not necessarily controlling,[11] questions in this case, for example, how Bracero's note was actually pledged to Girod by Development. It is hard to believe that Bracero would pledge the note to guarantee construction loans in excess of its outstanding liability and for a project that it no longer owned. Such a pledge would simply not be in Bracero's favor.

■ Additionally, like Bracero, we also question the validity of Development's pledge of Bracero's note to Girod. It fails at one of the three requirements for a pledge contract demanded by Article 1756 of the Civil Code of 1930, 31 L.P.R.A. Section 5001, that is, that the object of the pledge be owned with full property rights by the pledger, which in the present case would be Development. *Id.* Section 5001. Development's property rights related solely to the land which it purchased from Bracero in return for Development's payment of Bracero's debt to Girod. For Development to pledge the mortgage note to Girod, Girod must first have relinquished possession to Development, assumedly for some form of consideration. That has never been claimed by FDIC in this case. Furthermore, there has been no evidence presented nor any reason adduced for the

mortgage note to have ever been in Development's possession.

To determine whether or not Bracero is liable to Girod *qua* FDIC because of Development's pledging of Bracero's mortgage note to Girod pursuant to its Loan and Pledge Agreement with Girod, we must first determine if the doctrine of assumption of debt or that of novation apply.

Section 1159 of the Civil Code of 1930, 31 L.P.R.A. Section 3243 states that:

> Novation, consisting in the substitution of a debtor in the place of the original one, may be made without the knowledge of the latter, but not without the consent of the creditor.

Whereas, Article 164 of the Mortgage Law of 1979, 30 L.P.R.A. Section 2560, states in relevant part:

> When a mortgaged property is sold and the seller and the purchaser should have agreed that the buyer shall subrogate himself not only with respect to the liabilities derived from the mortgage, but also with respect to the personal obligations secured therein, the seller shall be released from said obligations, if the creditor gives his express or tacit consent.

The difference between the two statutes was recently articulated by the Supreme Court of Puerto Rico in *Teachers Annuity v. Soc. de Gananciales*, 115 D.P.R. 277 (1984). The case involved the sale of mortgaged property whereby the buyer expressly agreed in the purchase deed to assume the seller's mortgage debt. However, the creditor did not expressly agree to this transaction and, therefore, the court had to determine whether it nonetheless tacitly agreed, pursuant to Art. 164 of the Mortgage Law. The only evidence presented of any tacit consent by the creditor was his acceptance of some payments on the mortgage and related correspondence from the buyer. The Supreme Court of Puerto Rico found that payment of an obligation by a third party, a practice authorized by

---

**11.** Regardless of the answers to these particular questions the main issue, as will be discussed shortly, remains whether or not Development

assumed Bracero's debt and the same was cancelled through payment.

the Civil Code, without more, "can be interpreted as some other intent which is not necessarily that of consenting but rather simply one of accepting payment from a third party." *Id.* at 291 (translation ours). The Court explained further: "Tacit consent is always a question of intent and as such requires consideration of *all the circumstances of the case.*" *Id.* (translation ours).

To summarize, novation by substitution of debtor [12] requires certain and positive proof that the creditor had the deliberate purpose of accepting the new debtor and thereby extinguish any cause of action against the original debtor upon the debt, *id.* at 284; whereas assumption of debt, though it also requires the consent of the creditor, the same does not have to be manifest, i.e., expressed in a certain and positive manner. The creditor's implied consent suffices. *Id.* at 289 (citing F.A. Sancho Rebullida, *La Novación de las Obligaciones*, Barcelona, Ed. Nauta, 1963, p. 416).

In the case at bar, we find that the record does not evince a manifest intent on the part of Girod to substitute Development for Bracero as debtor for the pre-May 1984 "Las Brisas" construction loans. Girod did not sign the purchase deed between Development and Bracero and there is no document or testimony before us wherein Girod clearly expresses a novatory intent. However, looking carefully at the totality of the circumstances, we conclude that Girod did in fact *tacitly*, but clearly, consented to Development's assumption of Bracero's "Las Brisas" construction loans.

Unlike *Teacher's Annuity*, here we have much more than just the simple payment of a debt by some third party. Instead, we have a series of bank documents and internal transactions that, considered as a whole and placed in the factual context of the relevant time, convince us that Girod exonerated Bracero from all liability even though it later accepted Bracero's mortgage note as security for Development's debt. We feel that Girod acted that way out of traditionally slack banking procedures; an urgent interest to quickly complete the Árecibo project in order to culminate its investment, and a desire to save Development the many thousands of dollars it would cost to cancel an old mortgage and register a new one for what it (Girod) probably felt was achieving little more than adding some security to the construction project. It is entirely conceivable that Girod and Development, *but not Bracero*, decided to take the cost reduction risk of not having Development's loans secured by a validly instituted mortgage made by Development. Admittedly, this is bad banking practice but as the many cases filed before this District, including criminal indictments which have led to several convictions against Alberic Girod, President of the Girod Trust Company, and several of his officers, and as the FDIC receivership of the bank itself should attest, Girod had an unfortunate history of negligent, and at times unethical, banking procedures. The present case is but another example.

The record shows that Girod opened its arms widely to Development, provided it with money to pay off Bracero's debt as well as additional financing for the project while waving a fair goodbye to Bracero.

There is little doubt that when purchasing the Arecibo project, Development agreed, in lieu of a cash payment, to subrogate itself to Bracero's debt with Girod, to

---

**12.** Novation is today much broader than its Roman law genesis which was conceived simply as a way of extinguishing obligations between individuals. J.M. Manresa *Comentarios del Código Civil Español*, 6ta. ed., Madrid, Ed. Revis, 1967, T. 8, Vol. I, p. 895. Currently, novation encompasses the simple modification as well as the extinction of debts. *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378, 391–392 (1973). Assumption of debt, on the other hand, with its German legal foundations was first used to attenuate the inflexible novation doctrine which required that any change of debtor constituted the extinction of an old debt and the creation of a new one. This was seen as impractically affecting the flow of commerce. Assumption of debt, therefore, became the vehicle whereby a third party, with the consent of the creditor took on a preexisting debt, thus making himself a debtor while liberating the original debtor without changing the basic elements of the original contract. *See generally* R. Roca Sastre *Derecho Hipotecario,* 7ma ed., Barcelona, Ed. Bosch, 1979, T.1, Vol. 1, p. 415.

pay the full balance on Bracero's promissory note and to thereby cancel the mortgage. This fact is primarily evinced in purchase Deed No. 17 [13] subscribed by Bracero and Development and cannot be controverted by FDIC.

The sequence of events and the documents produced are telling. A short month after Development purchased the Arecibo land for $1,316,046.97, it entered into a loan and pledge agreement with Girod that mirrored the one Girod and Bracero had signed. The agreement between Development and Girod, though seemingly for over $3,000,000.00, was limited initially to a $1,600,000.00 credit line,[14] the use of which was subject to periodic certification of disbursements presented by Development and approved by Girod. In addition, for each outlay used by Development pursuant to the certifications, a concomitant promissory note would be issued by Development for the amount of the outlay. This supports Bracero's argument that the loan and pledge agreements were not the principal obligations but rather blueprints or master plans for subsequent obligations.

Four quick days after Development signed the loan and pledge agreement on May 22, 1984, Development had its first certification approved for $1,399,523.18. Pursuant to the certification, Girod credited $1,298,206.33 of the total amount to Bracero's balance on the construction loan.[15] On that day Bracero received a credit slip indicating that its construction loan had been cancelled through payment. This act shows that Girod implicitly agreed to Development's assumption of the original "Las Brisas" loan. That Girod then agreed to have a note that was effectively, albeit not formally, cancelled used as security for a new loan was certainly improper. Yet that impropriety by Girod does not somehow, as the FDIC would have it, revive Bracero's note. The note was cancelled through payment. Whether or not actual cash was paid is immaterial, the note was "cancelled" because Girod itself accepted payment of the totality of the amount owed to it and effectively cancelled Bracero's loan. Girod knew or should have known of the purchase deed whereby Development expressly agreed to assume Bracero's debt. It also facilitated Development with the money to pay the same.

On May 22, 1984, the same day that Bracero received the credit for the amount of its loan, the difference, $101,316.85, was credited to Development's account for payment of construction costs. Here again, Girod was acknowledging Development's new role as debtor of the construction project, as is also reflected in the minutes of Girod's construction Committee's meeting, of uncertain date, which *specifically* accepts Development as the new debtor.

In sum, the fact that Girod officially accepted Development as a new debtor on the Las Brisas project; that it provided

---

**13.** The relevant parts of the purchase deed read as follow in our translation:

"Second: That the described property is affected by a mortgage in the principal amount of $2,000,000 as stated in Public Deeds number 213 ... and number 10 ... (both subscribed) before the Notary Public Enrique N. Vela Colón. Said mortgage guarantees the interim financing for the construction of the Las Brisas de Arecibo project.
....

CLAUSES AND CONDITIONS
First: ....
It is made clear that THE SELLERS are not receiving any cash payment either at the moment of the present deed issuance or before the moment of the present deed issuance and that the price in its totality is being returned by THE BUYERS to satisfy in due course the mortgage that at present encumbers the property described (above)."

We note that the deed was executed before Enrique Vela Colón, the same person who notarized the loan and pledge agreement between Bracero and Girod and the one between Development and Girod.

**14.** This would also explain the particular language in Girod's Construction Committee's minutes to the effect that Girod should "accept the new debtor Development ... and *reduce the line of credit to $1,650,000...*" (Emphasis added.)

**15.** We find the difference between the purchase price of the lands (which according to the purchase deed was Bracero's balance on the note) and the amount actually credited to be insignificant for our purposes. It amounts only to approximately $18,000.00 and could easily be represented in some other disbursement in certification No. 1 or some form of savings achieved by Girod and/or Bracero on the transaction.

Development with financing sufficient to pay off Bracero's loan in its entirety and to continue the project; that Development issued separate and independent promissory notes for those debts; that there were no joint venture between Development and Bracero nor, as admitted by the FDIC, was there any relationship between the two vis-á-vis the transactions between Girod and Development; that Bracero's debt with Girod was satisfied according to the bank's own records introduced into evidence by FDIC itself; that the circumstances of the case and the sequence of events, in light of the questionable banking procedures used by Girod—especially during the year of its closing, 1984,[16] clearly show that Girod accepted Bracero's note as security for Development's debt with full knowledge that the same had been satisfied, are circumstances which unequivocally demonstrate Girod's intent to consent to Development's assumption of debt. In other words, Girod's conduct in the present case necessarily implies its agreement to the new order of things at the Las Brisas project. *See Teacher's Annuity*, 115 D.P.R. at 290.

■ Since Girod tacitly consented to have Development assume Bracero's debt and further permitted Development to use part of its initial financing to pay the same in full, Bracero was liberated of its liabilities towards Girod and FDIC's present claim, as acquirer of Girod's assets, must fail.

■ Having concluded that Bracero's promissory note to Girod was discharged through payment made by Development and official acknowledgment of credit and cancellation issued by Girod, section 472 of the Commerce Code of 1932; 19 L.P.R.A. Section 201; *see generally* Basilio Santiago Romero, *Tratado de Instrumentos Negociables*, 2nda. ed., Ed. Universitaria, 1981 (a negotiable instrument is discharged by payment in due course by or on behalf of the principal debtor), it follows that the mortgage that secured the same has no legal effect whatsoever since it is well estab-

lished under Puerto Rico law that a mortgage is accessory to a principal debt and automatically falls when the underlying debt does. R. Roca–Sastre, *Derecho Hipotecario*, 7ma. ed., Barcelona, Ed. Bosch, 1979, T. IV, V.1, pp. 273–275. Herminio Brau, "Derecho Inmobiliario Registral Puertorriqueño," 48 *Rev.J.P.R.*, 117, 462–463 (1979). Roca–Sastre asserts that a mortgage is a right that is completely accessory to the credit or loan that is being insured. ("En nuestro sistema la hipoteca es un *derecho accesorio* del crédito asegurado; aquella nace y muere con éste.") *Id.* at 273 (emphasis in original). Thus a mortgage is not an independent legal right, i.e., one with its own existence, but rather one that exists solely at the service of a credit or loan. In this sense, the mortgage is completely subordinate to the existence, extension or extinction of the debt it secures. *Id. See also Warner Lambert Co.*, 101 D.P.R. at 391.

■ Finally, FDIC cannot protect itself from the effects of Bracero's exoneration as debtor through the assumption of debt doctrine by invoking 12 U.S.C. Section 1823(e) which prohibits, except under certain circumstances, assertion of defenses to a note against FDIC as the note's assignee. Section 1823(e) essentially states that any agreement tending to diminish or defeat a right or interest of the FDIC in any asset it acquires must be, *inter alia*, in writing and must be executed by the interested parties contemporaneously with the acquisition of the asset by the bank. However, Section 1823(e) is inapplicable to the present case because the debt which forms the basis of the asset claimed by FDIC was satisfied *before* FDIC acquired the bank's assets. *Federal Deposit Ins. Corp. v. Nemecek*, 641 F.Supp. 740 (D.Kan.1986) (In a case involving the doctrine of accord and satisfaction, the court found that Section 1823(e) did not apply because "where the FDIC purchased the Bank's assets, it could not have purchased defendants' note, as it had been previously extinguished.") *See*

transactions at issue here.

---

**16.** The Girod Trust Company was closed on August 16, 1984, only a few months after the

also *F.D.I.C. v. Merchants Nat. Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). (Section 1823(e) does not apply where an asset is invalid and such invalidity is caused by acts independent of any understanding or side agreement.)

In addition, the Section was really intended to apply to secret agreements connected with the acquisition of assets. *See Federal Deposit Ins. Corp. v. Pioneer State Bank*, 15 N.J.Super. 381, 382 A.2d 958 (1977) (Ably discussing the legislative history of Section 1823(e) to this effect); *Nemecek, supra* (citing *D'Oench, Duhme & Co., Inc. v. F.D.I.C.*, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942) for the same proposition). Notice of Development's payment of Bracero's bank balance and the bank's own documentation cancelling the same were in the hands of FDIC at all relevant times and, in fact, were produced by FDIC at trial. Therefore, there was no secret agreement that would now permit FDIC to invoke the protection of Section 1823(e).

Based on the foregoing, we hold that Bracero is not liable to FDIC on the remaining claim of Count IV of the complaint. The same is accordingly DISMISSED.

The only issue remaining in the case is Count V of the complaint against the Prann defendants which has been stayed pending bankruptcy proceedings.

Partial Judgement shall be entered accordingly.

SO ORDERED.