**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Union National Bank of Chicago, Plaintiff–Appellant,**

v.

**Lillian WRIGHT, also known as Lillian Wright Lawler, Defendant–Appellee.**

No. 90–2217.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1991.
Decided Aug. 29, 1991.

Paul Richter, David L. Hazan (argued), Marc J. Chalfen, Dehaan & Richter, Chicago, Ill., Bea Valdez (argued), Federal Deposit Ins. Corp., Washington, D.C., for plaintiff-appellant.

Michael Anthony Lowe (argued), Emory A. Tate, Tate & Schroeder, Chicago, Ill., for defendant-appellee.

Before FLAUM, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

The Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver of a failed bank sued Lillian Wright, a former director of the bank, for amounts allegedly due under three facially unconditional notes signed by her. She claimed lack of consideration for two of the notes and payment in full for the other. The FDIC filed a motion *in limine* seeking to bar Ms. Wright's lack-of-consideration defense on the basis of the estoppel doctrine announced in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The court denied the motion and found for Ms. Wright on each of the three notes. For the following reasons, we reverse the judgment of the district court.

## I
## BACKGROUND

### A. *Facts*

On July 8, 1983, the Office of the Comptroller of the Currency declared the Union National Bank of Chicago (the Bank) insolvent and appointed the FDIC as receiver.[1]

---

1. The FDIC can assume two separate roles in its relationship to a failed bank. As a receiver, the FDIC manages and protects the failed bank's assets on behalf of its creditors and shareholders. In its corporate capacity, the FDIC insures the depositor's accounts. There are two primary options available to the FDIC when a bank fails: liquidation or purchase and assumption. The liquidation option is the easiest, but carries two significant costs. A bank closing weakens depositor confidence, and the depositor often must wait a substantial time before deposits are returned. For these reasons, the preferred option is for the FDIC to purchase and assume. When it exercises this option, the FDIC in its receiver capacity sells the failed bank's assets to a healthy bank, which in turn agrees to pay the failed bank's depositors. The FDIC also sells the failed bank's bad assets to itself in its corporate capacity. With the proceeds from the sale, the FDIC pays the healthy bank the difference between what the healthy bank must pay the depositors and what the healthy bank is willing to pay for the good assets. The FDIC in its corporate capacity then seeks to obtain payment

In that capacity, the FDIC reviewed the Bank's records in order to identify its assets and liabilities. In doing so, the FDIC discovered several unconditional promissory notes executed by Ms. Wright in favor of the Bank, which appeared to be past due. Thereafter, the FDIC brought a seven-count complaint against Ms. Wright and others. Three of the four counts against Ms. Wright are relevant to this appeal. Count II sought enforcement of a $25,000 note dated October 30, 1982; Count III sought to recover on a $75,200 note also dated October 30, 1982; and Count IV sought enforcement of a $27,000 note dated November 12, 1982.[2]

On September 10, 1986, the FDIC moved for summary judgment. In an interim ruling, the district court granted the motion on Count IV and also reserved its rulings as to Counts II, III and IV pending supplemental briefing. The court requested the parties to address whether the doctrine espoused in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), applied to the case, whether the *D'Oench* doctrine was preempted by the doctrine's partial codification in 12 U.S.C. § 1823(e), and whether the *D'Oench* doctrine applied when the FDIC acted in its capacity as receiver of an insolvent bank. *See FDIC v. Wright*, 684 F.Supp. 536, 540 (N.D.Ill.1988). To enable the FDIC to rely on a failed bank's records, the *D'Oench* doctrine precludes a borrower who has participated in a scheme or arrangement likely to mislead banking authorities from asserting unrecorded side agreements to defeat the FDIC's interest in any assets acquired from the bank.[3] In June 1988, the FDIC responded to the district court's request for supplemental briefing. It contended that the *D'Oench* doctrine applied and prevented Ms. Wright from asserting a lack-of-

consideration defense against the FDIC's claim on the notes. Moreover, the FDIC contended that *D'Oench* as a common law doctrine survived the enactment of 12 U.S.C. § 1823(e), which codified parts of the *D'Oench* doctrine, but applied only when the FDIC acted in its corporate capacity. Finally, the FDIC informed the court that *D'Oench* applied to the FDIC when acting in its capacity as a receiver of an insolvent bank. Thereafter, the district court granted the FDIC's motion for summary judgment on Counts II, III, and IV. The court based its ruling on the *D'Oench* doctrine.

> With regard to the applicability of the *D'Oench, Duhme* doctrine to the lack of consideration defense, plaintiff has argued persuasively that the doctrine precludes a defendant from relying on this defense when the contract on which the FDIC brings suit is silent with respect to the bank's obligations.... [T]he defendant cannot assert that the bank ... owed her a corresponding obligation, for such an unwritten obligation would clearly lend itself to an arrangement whereby the FDIC, in examining the bank's books, would be misled.

R.78.

Approximately six months after the court entered summary judgment, it granted Ms. Wright's motion to vacate the judgment. The motion was based upon newly discovered evidence. Ms. Wright alleged that she found a letter addressed to her from the Bank's president and a photocopy of the "Borrower's Copy" of the $75,200 note bearing an undated "canceled" notation. Over the FDIC's objection, the court reversed and vacated its earlier motion for summary judgment.

Thereafter the case proceeded to trial. In the parties' amended final pretrial order,

---

on the bad assets in order to cut the insurance fund's losses. The purchase and assumption option is frequently executed in great haste, often overnight. *See Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991).

**2.** Count V sought to recover on a note executed by Ms. Wright dated January 18, 1983 for $2585.82. The district court ruled in favor of

the FDIC for the balance due on that note, and Ms. Wright has not appealed that ruling. Counts I and VI were directed against other defendants, and Count VII was against Ms. Wright as guarantor of a note executed by another defendant.

**3.** We discuss the *D'Oench* doctrine more fully in our analysis section.

Ms. Wright stipulated that she signed and delivered the notes to the Bank. Moreover, she stipulated that the notes were among the assets held by the FDIC. Prior to the bench trial, the FDIC moved *in limine* to bar Ms. Wright from asserting any oral agreement supporting her position that the $25,000 and $75,200 notes lacked consideration. The motion was based upon Ms. Wright's admissions in the pretrial order and upon the *D'Oench* doctrine. The district court denied the motion. It was not satisfied that the FDIC had established a scheme likely to mislead banking authorities and preferred the FDIC to prove the existence of any scheme at trial.

At trial, Ms. Wright denied any obligation under the notes. As the FDIC had anticipated, she claimed lack of consideration for the $25,000 and $75,200 notes and also claimed satisfaction in full of the $27,000 note. She testified that she signed the $25,000 and $75,200 notes in an attempt to secure a line of credit for her business. She further stated that she signed the notes prior to the line of credit actually being approved upon the condition and understanding that a bank officer would hold the notes until the line of credit was approved. The Bank's board of directors did not approve the extension of credit, Ms. Wright testified, and she never received the proceeds of the notes. Moreover, she contended that the $27,000 note had been paid in full from funds held in her escrow account at the Bank. To support her contentions, Ms. Wright proffered the March 10, 1983 letter from Ona Kelley, the Bank's president. The letter reads in pertinent part:

> Take Note; [a]ll your notes have been consolidated from extension to canceled [sic]. As follows; [sic]
> 1. Acct. 41134–0 Nov. 10, 1981 amt. $65,000.00 (a line of credit) was consolidation of group # 539 of notes and account numbers 41188–0 Dec. 14, 1981 of 10,000.00. 2. Account # 40390–0 Dec[.] 23, 1980 of 30,000.00. 3[.] Account number 413919 July 1, 1982 of 25,000.00.
> Your current note that was rewritten from the notes above are one in the same[.] In other words[,] the above

notes and the 75,200.00 are the same. I hope at this you are not confuse[d], now your note Account number 416510 of 27,-000.00 is the only note we will not cancel. The reason we will not cancel your note account 416510 of 27,000.00 [is] because we are holding in Escrow 45,000.00 (forty[-]five thousand dollars) in accounts receiable [sic] that belong to you in the name of your company[ ] (Community Beauty & Barber Supply)[.]

> Since this [is] the only note that was executed properly[,] we will put it through[ ] because your accounts receiable [sic] more than justify the amount due[.] We will pay off the 27,000.00 (Twenty[-]seven thousand dollars) and deposit the balance in your Savings account as instructed by you.

Appellant's App. Ex. G.

### B. *District Court Opinion*

The court found that, while the notes were facially unconditional promises to pay, "there is no evidence that either the $75,200 note or the $25,000 note were ever approved by the loan committee or the Board of Directors as loans. No money was ever paid to Ms. Wright or credited to her account on the basis of those two notes." Mem. Op. at 3. The court further found that the March 10, 1983 letter was credible and that it canceled the $25,000 and $75,200 notes and evidenced payment of the $27,000 note. *See id.* at 4. The FDIC had submitted Ms. Wright's *checking* account statements to establish that she had insufficient funds to set off the balance due under the $27,000 note. The court observed, however, that the March 10 letter referred to an *escrow* account and "the FDIC has not proven that the note could not have been satisfied with the escrow funds." *Id.* at 5.

Turning to the applicable governing law, the court explained the doctrine announced in *D'Oench* and noted that 12 U.S.C. § 1823(e) partially codified the doctrine as it related to the FDIC in its *corporate* capacity. It then determined that section 1823(e) did not preempt the common law by precluding the application of the *D'Oench*

doctrine when the FDIC acted in its *receiver* capacity. *See* Mem. Op. at 6–8. Notwithstanding the doctrine's applicability, the court determined that the FDIC could not employ *D'Oench* in this case because it failed to satisfy a threshold requirement. "Even under *D'Oench,* the FDIC is obligated to prove that it acquired the notes from the bank's open files; that is, that at the time the FDIC took over, the bank carried the note as an asset. This the FDIC has not done." *Id.* at 9. The court remarked that the FDIC offered no testimony or evidence from anyone who inventoried the Bank's assets after it went into receivership. The court stated that the FDIC could not assert the significant power of the *D'Oench* doctrine unless the FDIC could establish that "it shouldered its responsibility to make *some* effort to ascertain whether the notes were valid. This the FDIC has not done, and therefore it is not entitled to the substantial advantage conferred by the *D'Oench* doctrine." *Id.* at 10 (emphasis in original).

Moreover, the FDIC failed to prove, under the preponderance of the evidence standard, that the $25,000 and $75,200 notes were in fact valid and, the court concluded, also had failed to carry its burden of proving that funds from the escrow account could not have satisfied the $27,000 note as the March 10 letter indicated. *See id.* at 10–11. Accordingly, the court found in favor of Ms. Wright on Counts II, III, and IV. The FDIC filed a timely notice of appeal.

## II

### ANALYSIS

#### A. *Guiding Principles*

##### 1. The *D'Oench* doctrine

We begin with a brief review of the origin and purposes of the *D'Oench* doctrine. In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the defendant and his bank contrived a scheme to deceive state regulators by falsely inflating the value of the bank's assets. The defendant executed a note in favor of his bank, but the bank never dis-

pensed any proceeds in exchange for the note. However, as part of the plan, the parties also agreed that the note would never be called due. Because of the fraudulent nature of the scheme, this agreement was not reflected in the bank's records. Eventually, the bank was unable to continue to conceal its weak financial condition, and the FDIC took over. When the FDIC sued the defendant for payment on the note, he claimed lack of consideration and offered his agreement with the bank as a defense. The Supreme Court reviewed the statutory provisions creating the FDIC and concluded that they revealed a federal policy of protecting the FDIC and the public funds it insures and administers against misrepresentations of a bank's assets. To effectuate this policy, the Court fashioned a common law rule of estoppel preventing a borrower from asserting a defense against the FDIC on the basis of secret or unrecorded "side agreements." The Court stated:

> The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 680–81. The Supreme Court further determined that the rule of estoppel should be applied even when the borrower was " 'very ignorant and ill-informed of the character of the transaction,' " and " 'may not have intended to deceive any person,' " and even if "creditors may not have been deceived or specifically injured." *Id.* at 458–59, 62 S.Ct. at 679–80 (citations omitted). *D'Oench* itself involved the FDIC in its corporate capacity; however, courts have consistently applied the estoppel doctrine in cases where the FDIC acts, as it does here, in its capacity as a receiver. *See Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 49 (1st Cir.1991) (citing cases).

#### 2. 12 U.S.C. § 1823(e)

■ Congress codified the *D'Oench* doctrine by enacting 12 U.S.C. § 1823(e), which, as the district court noted, originally applied to the FDIC only in its corporate capacity. However, the district court failed to recognize that, over four months prior to trial, section 1823(e) was amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, § 217(4), 103 Stat. 183, 256, making section 1823(e) directly applicable to the FDIC in its receiver capacity.[4] Thus, section 1823(e) in its present form reads:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or *as receiver of any insured depository institution*, shall be valid against the [FDIC] unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 1989) (emphasis supplied).[5]

In its motion *in limine*, the FDIC did not advise the court of this amendment to section 1823(e). The FDIC could have argued that section 1823(e) barred Ms. Wright's defense of lack of consideration because with the enactment of FIRREA—nearly four months before the FDIC filed its motion—section 1823(e) became applicable to cases involving the FDIC in its receiver capacity. Notwithstanding this opportunity, the FDIC proffered the *D'Oench* doctrine as the sole basis for its motion. The FDIC continued this course at trial. Counsel for the FDIC represented to the district court that section 1823(e) "refers to the corporation and it has been held that 1823(e) does not apply to a receiver, only in its corporate capacity to the FDIC." Tr. of Dec. 13, 1989 at 7. On appeal, for the first time, the FDIC presses section 1823(e) as a shield to Ms. Wright's lack-of-consideration defense.

The FDIC's actions in this case are not the level of representation federal courts deserve and expect from a government agency. We must now determine whether its dilatory actions prevent our considering section 1823(e) on appeal. Generally, arguments not raised in the district court are waived on appeal. *See, e.g., Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 (7th Cir.1990). Nevertheless, we con-

---

4. FIRREA was enacted August 9, 1989, and the two-day bench trial began December 13, 1989.

5. The Supreme Court articulated the objectives of section 1823(e) (and thus implicitly the *D'Oench* doctrine) in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). Writing for a unanimous Court, Justice Scalia stated:

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, and when the FDIC is deciding whether to liquidate a failed bank, or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank. The last kind of evaluation, in particular, must be made "with great speed,

usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

> A second purpose of § 1823(e) is ... [to] ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Id.* at 91–92, 108 S.Ct. at 401–02 (citations omitted); *accord FDIC v. State Bank of Virden*, 893 F.2d 139, 143 (7th Cir.1990); *FDIC v. O'Neil*, 809 F.2d 350, 353 (7th Cir.1987).

clude that the FDIC has not waived its right to assert section 1823(e). First, in substance, the argument actually was raised by the FDIC in the district court. At each stage of the proceeding, the FDIC argued that Ms. Wright could not assert an oral agreement that tended to diminish the FDIC's interest in an asset acquired from a failed bank. The FDIC simply misstated the law. Furthermore, it is unclear whether Congress intended the protections afforded the FDIC under section 1823(e) to be waived by failure to assert specifically the right to those protections. The banking crisis attending the passage of FIRREA suggests that Congress intended the requirements of section 1823(e) to be strictly followed in order to maintain the integrity of the FDIC as an insurer of federally insured deposits. Accordingly, we believe we may apply the present version of section 1823(e) unless we determine that it may not be applied retroactively. We now turn to that question.

### 3. Retroactivity of FIRREA

■ Relying on *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), Ms. Wright argues that section 1823(e) as amended should not apply to the FDIC in its capacity as a receiver because a "manifest injustice" would result. *Bradley* provides the appropriate framework for determining when to apply recently enacted statutes to cases pending before their enactment. There, the Supreme Court instructed courts "to apply the law in effect at the time it renders its decision, unless doing so would

result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711, 94 S.Ct. at 2016; *see National Labor Relations Bd. v. Bufco Corp.,* 899 F.2d 608, 611–12 (7th Cir.1990). Hence, section 1823(e) as amended governs this case unless either of the two *Bradley* exceptions are satisfied.

We turn first to FIRREA and its legislative history for any indication that Congress intended FIRREA to apply only prospectively. *Bradley* established a presumption of retroactivity for legislative enactments, which may be displaced by " 'a fair indication that the statute, properly construed, has only prospective effect.' " *Campbell v. United States,* 809 F.2d 563, 572 (9th Cir.1987) (quoting *Litton Sys. v. American Tel. & Tel. Co.,* 746 F.2d 168, 174 (2d Cir.1984)); *accord Brooks v. United States,* 757 F.2d 734, 742 (5th Cir.1985). However, when the legislative history could support either view, the statute should be applied retroactively. *See Bradley,* 416 U.S. at 715–16, 94 S.Ct. at 2018–19; *Campbell,* 809 F.2d at 572.[6] The FDIC points out that neither the committee reports nor the floor debates on FIRREA indicate that newly amended section 1823(e) should be applied only prospectively. Likewise, our research reveals no such indication.[7] However, we can glean insight into the purpose of amended section 1823(e) from the House Committee on Banking, Finance and Urban Affairs Report on FIRREA. According to that report, section 212, which expanded the conservatorship and receivership powers of the FDIC, was

---

**6.** The Supreme Court itself recently has noted that a tension exists between the presumption of retroactivity emphasized in cases such as *Bradley* and a presumption of nonretroactivity emphasized by cases such as *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). *See Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 1576–77, 108 L.Ed.2d 842 (1990). The Court in *Kaiser* declined to resolve that tension.

Despite the existence of an alternative line of precedent, we believe there is no prejudice in

applying only *Bradley* and its progeny to the facts in this case. Any tension between the two lines of precedent is negated because, under *Bradley,* a statute will not be deemed to apply retroactively if it would threaten manifest injustice by disrupting vested rights. *See* 416 U.S. at 720–21, 94 S.Ct. at 2020–21.

**7.** *See FDIC v. Dalba,* No. 89–C–712–S, 1990 WL 43750 at *3 (W.D.Wis. Feb. 27, 1990) ("Neither of the parties has presented the Court with any legislative history indicating a Congressional intent to apply the statute retroactively or prospectively. Neither has this Court's independent review of the legislative history of the [FIRREA] revealed such intent.").

"designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 330, *reprinted in* 1989 U.S.Code Cong. & Admin.News 126. Accordingly, a reasonable interpretation of the receivership provisions contained in FIRREA (including section 217, which amended 12 U.S.C. § 1823(e)) is that Congress included those provisions to aid the FDIC in its immediate responsibilities of dealing with mounting bank failures in this country. A retroactive application of FIRREA would further that congressional intent.

As for *Bradley*'s second exception, we perceive no threat of manifest injustice in the present case. Ms. Wright asserts that manifest injustice would result if section 1823(e) were applied retroactively to cases involving the FDIC in its receiver capacity because the FDIC failed to provide evidence that the notes were actually assets carried by the bank and because it further failed to demonstrate that it distinguished between closed and open files. Ms. Wright's arguments focus on irrelevant considerations. As we noted in *In re Busick*, 831 F.2d 745, 748 (7th Cir.1987), the Supreme Court in *Bradley* enumerated three factors that courts should consider in determining whether a manifest injustice will result from applying a legislative enactment to cases pending prior to the enactment of that legislation. "These factors included: 1) the nature and identity of the parties; 2) the nature of the rights affected; and 3) the impact of the change in law on pre-existing rights." *Id.* (citing 416 U.S. at 717, 94 S.Ct. at 2019).

The first factor weighs against a finding of manifest injustice. This is not simply a private case between individuals. It involves a federal agency appointed as a receiver of a failed bank in the midst of a national banking crisis. The *Bradley* Court's reliance on Chief Justice Marshall's comment is instructive on this point: " 'It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of the parties, but in great national concerns ... the court *must* decide according to existing laws....' " 416 U.S. at 712, 94 S.Ct. at 2016 (quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801)) (emphasis supplied); *see id.* at 719, 94 S.Ct. at 2020. As our colleagues on the Eighth Circuit have noted, "[n]ational concerns and public parties encourage retroactive application of the legislation at issue." *Seniors United for Action v. Ray*, 675 F.2d 186, 189 (8th Cir. 1982). In the present case, a federal agency is involved, and the circumstances leading to the enactment of FIRREA involved matters of great national concern.[8]

The second factor supports a determination of manifest injustice when retroactive application of the statute "would infringe upon or deprive a person of a right that had matured or become unconditional." *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020. Similarly, the third factor focuses on "the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Id.* Neither of these concerns are present here. Section 1823(e) as amended simply codified the existing common law *D'Oench* doctrine by giving it "statutory backing." *FDIC v. State Bank of Virden*, 893 F.2d 139, 143 (7th Cir.1990) "[C]ourts have found the aims of section 1823(e) and *D'Oench* identical and thus have construed defenses premised upon section 1823(e) and *D'Oench* in tandem." *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382 (11th Cir.1991). *But cf. FDIC v. O'Neil*, 809 F.2d 350, 353 (7th Cir.1987) ("The statute makes the common law principle both more encompassing and more precise."). Consequently, Ms. Wright could have harbored no reasonable expectation that the *D'Oench* doctrine would not apply to her case based on the fact that FDIC was acting in its receiver capacity.

---

8. *See, e.g.,* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 304–05, *reprinted in* 1989 U.S.Code Cong. & Admin.News 100–01 (quoting Treasury Secretary Nicholas Brady's comment about "the savings and loan crisis" and President Bush's remark that it was a "national problem").

Ms. Wright originally proffered an *oral* agreement as a defense to the FDIC's claim for the $25,000 and $75,200 notes signed by her. *D'Oench* clearly applied to that situation, and applying section 1823(e) to that same situation results in no manifest injustice. Moreover, we find no manifest injustice in applying section 1823(e) to the *written* letter that Ms. Wright alleges confirmed the oral understanding. Even under Ms. Wright's theory of the case, the writing is relevant only when read in conjunction with the alleged oral agreement. While *D'Oench* applies to cases when "the maker's defense depend[s] solely upon a secret or unrecorded agreement, *usually oral*, of which the FDIC could have had no notice," *Howell v. Continental Credit Corp.*, 655 F.2d 743, 747 (7th Cir.1981) (emphasis supplied), authority exists for the application of *D'Oench* when the agreement is written and does not manifest facially bilateral obligations found in the records of the bank. *See, e.g., Savers Fed. Sav. & Loan v. Amberley Huntsville, Ltd.*, 934 F.2d 1201, 1206 (11th Cir.1991) (party may not assert collateral written agreement by bank not to collect note under *D'Oench*); *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 383 (11th Cir.1991) (applying *D'Oench* and retroactively applying 1823(e) to written agreement in case involving FDIC as receiver).[9] Moreover, even before the amendment of section 1823(e), Ms. Wright would have been subject to its strictures if the FDIC had sued her in its corporate capacity. Therefore, in ordering her financial affairs, she could not have relied reasonably on a restrictive interpretation of the common law *D'Oench* doctrine. In sum, we conclude that retroactively applying the receiver provision of section 1823(e) would not infringe upon any matured right held by Ms. Wright or impose any new obligation upon her without

notice. Amended section 1823(e) applies in the present case.[10]

**B. Application of the Principles to This Case**

1. The $25,000 and $75,200 notes

■ The FDIC challenges the district court's denial of its motion *in limine* based on *D'Oench*. As we noted, the motion sought to bar Ms. Wright's defense that the facially unqualified notes lacked consideration. In general, we will not disturb a court's denial of a motion *in limine* absent an abuse of discretion. *See United States v. Studley*, 892 F.2d 518, 534 (7th Cir.1989); *Pearl v. Keystone Consol. Indus., Inc.*, 884 F.2d 1047, 1052 (7th Cir.1989). In this case, however, the court based its ruling on an application of the *D'Oench* doctrine, a question of law, which we review *de novo*. *See Rheinstrom v. Commissioner*, 925 F.2d 1066, 1068 (7th Cir.1991). Accordingly, we may find an abuse of discretion if we conclude, by independent review, that the court misapplied *D'Oench*. *Cf. Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014 (7th Cir.1990) (standard of review varies with assorted functions performed by district court).

That is precisely what the FDIC contends. The misapplication of *D'Oench* is manifest, the FDIC argues, in the court's ruling that the FDIC failed to establish a scheme likely to mislead banking authorities as required by *D'Oench*. The FDIC maintains that it met this requirement by proffering the unqualified promissory notes and Ms. Wright's stipulation that she executed and delivered them. Furthermore, relying on our decision in *FDIC v. Venture Contractors, Inc.*, 825 F.2d 143 (7th Cir.1987), the FDIC maintains that the court imposed on it an improper and unreasonable burden by requiring it to prove the

**9.** Courts have recognized that, when a writing manifesting bilateral obligations *appears in the bank's records*, *D'Oench* does not aid banking authorities. *See Twin Constr. Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 383 (11th Cir.1991) (citing *FSLIC v. Two Rivers Assocs.*, 880 F.2d 1267, 1275 (11th Cir.1991)).

**10.** Our conclusion is in accordance with other courts that have addressed the issue of the retroactivity of FIRREA. *See, e.g., Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 381–82 (11th Cir.1991); *Resolution Trust Corp. v. Dismuke*, 746 F.Supp. 104 (N.D.Ga.1990); *FDIC v. Sullivan*, 744 F.Supp. 239 (D.Colo.1990); *FDIC v. Dalba*, No. 89–C–712–S, 1990 WL 43750 at *4 (W.D.Wis. Feb. 27, 1990).

validity of the notes through evidence of their location at the time the inventory was conducted at the Bank's closing. In a most cursory fashion, Ms. Wright argues that the district court correctly applied *D'Oench* and essentially adopts its analysis.

### a. establishing a scheme likely to mislead banking authorities

In denying the FDIC's motion *in limine,* the district court misapprehended the requirement of proving a scheme or agreement likely to mislead banking authorities under *D'Oench.* The Supreme Court has held that the signing of a facially unqualified note subject to an unrecorded condition is itself likely to mislead banking authorities.

> Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme* ) or of the truthfulness of a warranted fact.

*Langley v. FDIC,* 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987).[11] In this case, Ms. Wright signed facially unqualified notes for $25,000 and $75,200, but asserted a side agreement with the bank that they would not be payable if the board of directors failed to approve them. Therefore, she participated in a scheme that was likely to mislead banking officials. Ms. Wright's position is similar to that of the defendant in *FDIC v. McClanahan,* 795 F.2d 512 (5th Cir.1986). Hoping to obtain equipment financing, the defendant signed and delivered to a bank a blank promissory note with the understanding that it would be filled in later to reflect the terms of the loan. The loan was never approved, and the defendant sought financing elsewhere.

He did not, however, request the return of the note. Unbeknownst to the defendant, an officer at the bank filled in the terms of the note and pocketed the proceeds. Subsequently, the bank failed, and the FDIC sought payment on the note that bore the defendant's signature. The defendant, like Ms. Wright, raised the defense of failure of consideration. *See id.* at 514. The district court had ruled that *D'Oench* was inapplicable because the defendant did not make a "secret agreement" with the bank. Characterizing the defendant's conduct as "reckless," the Fifth Circuit reversed and held that the defendant had " 'lent himself to a scheme or arrangement whereby the [appropriate] banking authority ... was or was likely to be misled.' " *Id.* at 516–17 (quoting *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 681).

Likewise, in *FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991), the defendants admitted that they had signed facially unconditional notes, but contended that the bank filled in the amounts without their authorization. The court concluded that the *D'Oench* doctrine precluded them from asserting that defense against the FDIC. "By signing blank notes, the [defendants] 'lent themselves' to a scheme that could mislead bank examiners. 'An unscrupulous bank officer could overstate the amount of the note and thus overstate the bank's assets.' " *Id.* at 2. The court further noted that "under *D'Oench,* [the defendants] may not rely on a condition that was not reflected in the bank's official records, even if their reliance was in good faith and there was no intent to defraud." *Id.* Thus, the *D'Oench* doctrine is applicable even though Ms. Wright may not have intended to defraud. "[T]he *D'Oench* doctrine applies where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing."[12] *Tim-*

---

11. While *Langley* involved the application of 12 U.S.C. § 1823(e), courts "often consider the *D'Oench, Duhme* doctrine and § 1823(e) in tandem." *Beighley v. FDIC,* 868 F.2d 776, 784 (5th Cir.1989); *see, e.g., Langley,* 484 U.S. at 92–93, 108 S.Ct. at 401–02; *Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 382 (11th Cir.1991); *FDIC v. McClanahan,* 795 F.2d 512, 516 (5th Cir.1986).

12. The *Caporale* court explained the reason for the apparently harsh application of the *D'Oench* doctrine: "As among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded." 931 F.2d at 2; *see FDIC v. State Bank of Virden,*

*berland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 49 (1st Cir.1991). Accordingly, the estoppel doctrine articulated in *D'Oench* prevents Ms. Wright from asserting, as a defense against the FDIC, the agreement with the Bank that the $25,000 and $75,200 notes would not be payable unless the board of directors approved them.[13] Furthermore, section 1823(e) likewise prohibits Ms. Wright from asserting her side agreement with the bank as a defense. "A condition to payment of a note ... is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." *Langley*, 484 U.S. at 96, 108 S.Ct. at 403. Ms. Wright has offered nothing to demonstrate that any of the four requirements under section 1823(e) were met when she made the agreement with the bank. We conclude that the district court abused its discretion in denying the FDIC's motion *in limine.*

b. FDIC's burden of establishing an asset's validity

■ We also agree with the FDIC that the district court denied it the operation of the *D'Oench* doctrine by imposing an improper burden on it. Citing no authority, the district court required the FDIC to prove that the notes were from the Bank's open files, or in other words were in fact assets carried by the Bank, before the FDIC could invoke the *D'Oench* doctrine. In *FDIC v. Venture Contractor, Inc.*, 825 F.2d 143 (7th Cir.1987), the defendant was

a guarantor of a note acquired by the FDIC as receiver of a failed bank. The defendant contended that his guaranty was not an asset of the bank and that the FDIC must have obtained it from a closed file. The issue at trial therefore was "whether the guaranty instrument had previously been placed in the bank's active or inactive files." *Id.* at 145. The FDIC offered no evidence as to the location of the guaranty at the time of the bank's closing (in fact it stipulated that it did not maintain such records). Instead, the FDIC rested solely on an assertion of general practice. It offered the deposition of an FDIC employee who testified that it was never the practice of the FDIC nor was it during the closing of the bank to take written instruments from closed or inactive files once a bank had been closed. *See id.* at 145. The district court accepted this evidence and found:

"It is unlikely that the FDIC would go rummaging through closed or inactive files, and the parties agree ... that it was not the FDIC's practice generally or at [the bank] to remove written instruments from files which were closed or inactive files.... The FDIC rested solely upon an assertion of a general practice; defendant rested upon inferences arising from his assertion that the guaranty was in fact dead.

. . . .

[E]ven if we assume that the FDIC has the burden of showing the location of the guaranty, by far the more reasonable inference is that it was among the active

893 F.2d 139, 144 (7th Cir.1990). On this topic, the Fifth Circuit's colorful comments are insightful:

The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments? Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabil-

ities. Perhaps mindful of the fate that befell the Baker, whose search for the Snark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away."

*Bowen v. FDIC,* 915 F.2d 1013, 1016 (5th Cir. 1990) (citation omitted).

**13.** Other courts have found that *D'Oench* bars a defendant from asserting a lack-of-consideration-type defense in an action by the FDIC or the FSLIC upon a facially unconditional note. *See, e.g., FDIC v. McCullough,* 911 F.2d 593, 601 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *FSLIC v. Wilson,* 722 F.Supp. 306, 312–13 (N.D.Tex.1989); *FDIC v. Sarvis,* 697 F.Supp. 1161, 1164 (D.Colo. 1988).

files of the bank, and this court so finds."

*Id.* at 146. We relied on the above analysis in affirming the district court's finding that the guaranty was a valid asset. *See id.* at 146–47.

Without deciding whether the FDIC in fact must shoulder the burden of proving the validity of an asset it acquires, *Venture* teaches that the FDIC can raise a reasonable inference of an asset's validity by resting "solely upon an assertion" that as a "general practice" it does not remove written instruments from closed or inactive files once the bank has been closed. *Id.* at 145. In this case, a FDIC bank liquidation specialist testified as to the general practices employed by the FDIC in inventorying the assets of a failed bank. The record suggests nothing to indicate that this general practice was not followed by the FDIC in this case. We also believe that, as was the case in *Venture,* it is unlikely that the FDIC went rummaging through the Bank's closed or inactive files to find the notes executed by Ms. Wright.[14] Ms. Wright's own stipulations support this conclusion. She specifically stipulated that she signed and delivered the notes and that all three notes at issue were among the *assets* held by the FDIC. Accordingly, we reasonably may infer that the notes were valid assets without evidence as to their location at the time of the Bank's closing.

In conclusion, the district court misapplied the *D'Oench* doctrine and section 1823(e). *D'Oench* and section 1823(e) barred Ms. Wright from asserting her side agreement with the bank as a defense to the FDIC's claim against her on the $25,000 and $75,200 notes. It is apparent from the record that the side agreement was Ms. Wright's only defense as to these notes. Therefore, in addition to granting the motion *in limine,* the court should have entered judgment in favor of the FDIC on Counts II and III.

**2. The $27,000 note**

■ Ms. Wright proffered the March 10, 1983 letter to support her defense that the $27,000 note was satisfied from funds held in her escrow account. The district court credited that letter as evidence of payment in full of the $27,000 note. While the court evaluated the $25,000 and $75,200 notes in light of the *D'Oench* doctrine and section 1823(e), it failed to do the same with the $27,000 note. We do so now in the context of our independent review of the impact that the *D'Oench* doctrine and section 1823(e) have on this case.

Section 1823(e) is triggered because the agreement embodied in the letter would tend "to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... as receiver of any insured depository institution." 12 U.S.C.A. § 1823(e) (West 1989); *see also Public Loan Co., Inc. v. FDIC,* 803 F.2d 82, 84–85 (3d Cir.1986) (section 1823(e) barred defense of accord and satisfaction); *FDIC v. Waldron,* 630 F.2d 239, 241 (4th Cir.1980) (section 1823(e) barred defense of oral discharge of loan obligation). While the letter satisfies the writing requirement of section 1823(e)(1), it does not satisfy at least two of the other three requirements. The agreement was not executed "contemporaneously with the acquisition of the asset" by the bank. 12 U.S.C. § 1823(e)(2). Ms. Wright signed the note on November 12, 1982, and the letter was written almost four months later on March 10, 1983. Moreover, there is no evidence that the agreement was approved by the Bank's board of directors or loan committee as reflected in the minutes of either of those bodies. *See id.* § 1823(e)(3). There is some dispute whether the agreement was "continuously, from the time of its execution, an official record" of the Bank. *Id.* § 1823(e)(4). At oral argument, counsel for the FDIC stated that the FDIC found the letter among the Bank's records. After studying the issue carefully, we be-

**14.** *See also FDIC v. Cover,* 714 F.Supp. 455, 457–58 (D.Kan.1988) (FDIC's bank liquidation specialist's testimony that notes at issue were reflected as assets in failed bank's files established the validity of the notes); *FDIC v. Powers,* 576 F.Supp. 1167, 1169 (N.D.Ill.1983) (rejecting as frivolous defendants' contention that their facially unconditional written guarantees were not "assets" under section 1823(e)).

lieve counsel's concession to be unquestionably contrary to the record in this case. Furthermore, the issue is not controlling. Failure to satisfy one of the requirements of section 1823(e) is fatal to any agreement covered by that section. "The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement that meets them prevails ... [and] an agreement that does not meet them fails.... Such a categorical recording scheme is of course not unusual." *Langley*, 484 U.S. at 95, 108 S.Ct. at 403.

Ms. Wright's defense is similar to that offered in *FDIC v. P.L.M. Int'l, Inc.*, 834 F.2d 248 (1st Cir.1987). There, the FDIC as receiver of a failed bank sought to hold the defendants liable as guarantors of a mortgage carried by the failed bank. The defendants proffered a written agreement executed by the failed bank releasing them from all obligation under the mortgage. *See id.* at 250. The court held that the written release satisfied only the first of section 1823(e)'s four requirements and therefore "the release has no validity against the FDIC and affords no protection in this action." *Id.* at 253. Like the defendants in *P.L.M.*, Ms. Wright argues that her obligation under the note was discharged pursuant to a written agreement executed by the Bank. However, that agreement, like the release agreement in *P.L.M.*, fails to satisfy the requirements enumerated in section 1823(e). Thus, her defense based on that agreement must fail.[15]

### Conclusion

The district court misapplied the *D'Oench* doctrine and 12 U.S.C. § 1823(e). A proper application of both would have precluded the defenses raised by Ms. Wright against the FDIC's actions on all three notes at issue here. Accordingly, we reverse the judgment of the district court.

REVERSED.

---

15. *See also FDIC v. Manatt*, 922 F.2d 486, 488–89 (8th Cir.1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991) (written agreement executed by bank purportedly releasing borrower-defendant of indebtedness failed to satisfy requirement that agreement be approved by and reflected in minutes of board of directors or loan committee); *FDIC v. Rivera–Arroyo*, 907 F.2d 1233, 1236 (1st Cir.1990) (written release agreements failed to satisfy the requirements of section 1823(e)).