(No. 76106.—

FEDERAL DEPOSIT INSURANCE CORPORATION, Appellee and Cross-Appellant, v. MICHAEL J. O'MALLEY, Appellant and Cross-Appellee.

*Opinion filed October 27, 1994.—Rehearing denied December 5, 1994.*

BILANDIC, C.J., and HARRISON, J., dissenting.

Callahan, Fitzpatrick, LaKoma & McGlynn, of Oak Lawn (David A. Novoselsky, of Chicago, of counsel), for appellant and cross-appellee.

Marc J. Chalfen, of DeHaan & Richter, P.C., of Chicago (Richard J. Osterman, Jr., and J. Scott Watson, of Washington, D.C., of counsel), for appellee and cross-appellant.

JUSTICE NICKELS delivered the opinion of the court:

This case involves an action by plaintiff, the Federal Deposit Insurance Corporation (FDIC), to enforce a guarantee signed by defendant, Michael J. O'Malley, in connection with a bank loan. The bank that made the loan subsequently failed. The FDIC then took control of the bank's assets and found the guarantee in the bank's files. At trial, O'Malley argued that the guarantee was invalid from the outset or, in the alternative, had been extinguished by the bank before the FDIC acquired the bank's assets. The circuit court found, as a matter of law, that these defenses were barred by 12 U.S.C. § 1823(e) (1988). The circuit court therefore ruled in favor of the FDIC, and the appellate court affirmed. (249 Ill. App. 3d 340.) For the following reasons, we affirm the judgment of the appellate court.

## I. Facts

The parties presented the following evidence at trial. In 1975, Michael J. O'Malley and Wayne J. Bekta were directors and shareholders of the First National Bank of Oak Lawn (the Bank). They had also worked together as business partners in past real estate transactions. In 1975, O'Malley and Bekta became interested in purchasing and developing a tract of real estate located in Country Club Hills, Illinois. At this time, O'Malley and Bekta were acquainted with Dennis Dine, whom they knew as a customer of the Bank and an experienced real estate developer. They therefore approached him and asked him if he would participate in the purchase of the Country Club Hills property. Dine agreed. The three of them subsequently determined that Dine would apply for a loan from the Bank and purchase the property. Later, if the property showed a profit from development or sale, the three would split this profit.

When Dine applied for the loan, he submitted the property as collateral. Bekta and O'Malley decided that, if the Bank did not approve the loan, they would offer their personal guarantees as security. O'Malley and Bekta therefore signed a guarantee in the amount of $225,000, the purchase price of the Country Club Hills property. They did not wait to see if the Bank would approve the loan without this additional security.

At trial, O'Malley acknowledged signing the guarantee and conceded that he was generally aware of the legal effect of a guarantee. O'Malley stated that he left the signed guarantee with Bekta but that he was uncertain of what happened to the guarantee after that point. The guarantee and two promissory notes signed by Dine were later found in the Bank's files. At trial, O'Malley claimed that the guarantee was not intended to be used unless additional security was needed. Dine also testified with respect to O'Malley's guarantee and supported O'Malley's testimony. He stated that he was unaware

that Bekta or O'Malley had guaranteed the loan. The first time he became aware of any such guarantee was during his deposition.

John Geary was the loan officer who handled and approved the loan to Dine in 1975. Geary was also president of the Bank. At trial, Geary testified that the only collateral required for the loan was the Country Club Hills property. The purchased property was appraised at $420,000 and would therefore adequately serve as collateral for a loan of $225,000. Geary testified that he first saw the guarantee during a deposition before trial.

O'Malley offered bank records into evidence. No reference to a guarantee was found in the loan proposal, the collateral checklist, or a collateral audit report. Other bank records also did not refer to the guarantee. In addition, Paul Adamonis, an employee of the FDIC, testified that he found no mention of the guarantee in the bank records, aside from the guarantee itself.

The Bank later sold the Dine notes to La Salle National Bank (La Salle). La Salle's records did not refer to a guarantee signed by O'Malley and Bekta. La Salle later sold the notes back to the Bank.

In 1979, four years after the Bank made the loan to Dine, O'Malley decided to end his relationship with the Bank. He therefore sold his stock and resigned as director. According to O'Malley, as part of the termination, the Bank and O'Malley exchanged mutual releases. At trial, O'Malley introduced a letter from the Bank, dated October 1, 1979, which purported to release O'Malley from any obligations he owed to the Bank, including guarantees. This letter did not refer to the Dine notes. The letter was signed by Bank president Geary and notarized by vice-president Adams. At the time, Geary had the requisite authority to release guarantees in the amount of $225,000, the amount of the guarantee. Neither Geary nor Adams was aware of the guarantee signed by O'Malley.

O'Malley also introduced a letter dated October 4, 1979, that he purportedly wrote to the Bank. In the letter, O'Malley released the Bank from any obligations it owed to him. Geary testified that he placed both letters in the bank files.

Adamonis, the FDIC examiner, testified that he did not find any releases in his examination of bank records. Adamonis searched Dine's loan file, the board of director minutes, the loan committee minutes, internal audit reports, and other bank records. Adamonis did not find any personal loan file of O'Malley among bank records. He also stated that the FDIC possessed 400 or 500 boxes of bank documents and that he had not personally inspected all of the documents. Adamonis had not personally inspected Bekta's personal loan file or the bank corporate files.

On April 29, 1983, about $3^1/2$ years after the purported releases were exchanged, the Bank was declared insolvent. The FDIC took control of the Bank and acquired its assets. James Murphy, an FDIC employee, testified with respect to the closing procedures used by the FDIC. Murphy testified that he closed the Bank pursuant to standard FDIC procedures.

During the closing, Murphy found the guarantee signed by Bekta and O'Malley among the Bank's collateral files. The guarantee, on its face, provided that it was absolute, continuing, and applied unconditionally to all of Dine's obligations at the Bank, as they existed or would exist in the future. The guarantee also authorized the Bank to extend and renew Dine's obligations, authorized release of the guarantors, and authorized the Bank to waive notice and demand. Under the terms of the guarantee, no action by the Bank would impair the Bank's rights against either guarantor. The guarantee was specifically limited to $225,000, plus interest due on the note and legal expenses.

During the closing, Murphy also found two outstanding and unpaid notes signed by Dine. The note relating to the Country Club Hills real estate had been renewed by Dine, and the principal under the renewal note was $279,456.49. Murphy also found another note for $643,852.50 signed by Dine. Dine did not pay any principal or interest on these notes. The FDIC subsequently sought repayment from Dine but Dine filed for bankruptcy. On September 15, 1983, the FDIC demanded payment from O'Malley under the terms of the guarantee. O'Malley refused and the FDIC brought this action. Further facts will be provided as needed for discussion.

## II. Lower Court Proceedings

After a bench trial, the circuit court found that Dine was indebted to the Bank in excess of $225,000, that O'Malley had executed a guarantee for $225,000, and that the FDIC located the guarantee in the collateral files of the Bank. It then found that O'Malley was barred under 12 U.S.C. § 1823(e) (1988) from arguing that the guarantee was legally insufficient or had been extinguished. Accordingly, the circuit court entered judgment in favor of the FDIC for $464,490.89, representing $225,000 in principal and $239,490.89 in interest.

On January 16, 1990, O'Malley filed a post-trial motion in which he asserted that he was entitled to a new trial because, *inter alia*, the circuit court judge should have disqualified himself pursuant to Supreme Court Rule 63(C)(1)(c) based on his prior representation of the FDIC. O'Malley also contested, *inter alia*, the amount of interest awarded by the circuit court. After a hearing, the circuit court denied the motion for a new trial but reduced the amount of interest awarded from $239,490.89 to $81,666.14. The appellate court affirmed the judgment but modified the award of interest from $81,666.14 to $83,446.71.

On appeal to this court, O'Malley raises, *inter alia*,

the following issues: (1) whether the circuit court judge violated Supreme Court Rule 63(C)(1)(c) by failing to disqualify himself; (2) whether 12 U.S.C. § 1823(e) (1988) bars O'Malley from asserting that the guarantee was not an asset of the Bank; and (3) whether section 1823(e) is constitutional. The FDIC has cross-appealed, claiming that the award of interest by the lower courts was incorrect. Other issues raised by O'Malley are discussed below.

### III. Disqualification of the Circuit Court Judge

O'Malley first argues that the circuit court violated Supreme Court Rule 63(C)(1)(c). At the time of trial, this Rule provided:

"C. Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where
* * *
(c) he was, within the preceding three years, associated in the private practice of law with any law firm or lawyer currently representing any party in the controversy *** or, for a period of seven years following the last date on which he represented such a party, he represented any party to the controversy while he was an attorney engaged in the private practice of law." (113 Ill. 2d R. 63(C)(1)(c).)

If a judge is disqualified under Rule 63(C)(1)(c), the judge may still participate in the proceedings. At the time of trial, Supreme Court Rule 63(D) provided:

"D. Remittal of Disqualifioation.

A judge disqualified by the terms of Canon 3(C)(1)(c) *** may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship or interest is immaterial, the judge is no longer disqualified and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding." 113 Ill. 2d R. 63(D).

O'Malley contends that the circuit court judge represented the FDIC within seven years of the commencement of trial. O'Malley argues that the judge participated in the case even though the parties did not complete a written remittal of disqualification. O'Malley argues that disqualification can only be waived by a written remittal. Thus, according to O'Malley, there was no effective waiver of disqualification and a new trial is required. We disagree.

The record reveals the following pertinent facts. On March 13, 1989, before trial, the circuit court judge disclosed his previous representation of the FDIC and his involvement in the liquidation of Gateway National Bank. The judge did not disclose how recent his representation of the FDIC was. Both sides indicated orally that they had no objection to the judge continuing in the case.

The case then went to trial. O'Malley did not raise the issue of disqualification during trial, and the judge entered judgment in favor of the FDIC. On January 16, 1990, ten months after the judge disclosed his representation of the FDIC, O'Malley filed a post-trial motion, asking the judge to grant a new trial because the judge had failed to disqualify himself and obtain a written remittal. After the post-trial motion was filed, the judge investigated further and discovered that he had worked on three FDIC cases as an attorney about six years before trial. These cases all involved the liquidation of Gateway National Bank. The judge stated that he had been unaware his representation of the FDIC occurred within seven years of trial.

The judge then disclosed the following additional information to the attorneys:

THE COURT: "Yes, I personally represented the FDIC in all three of those cases.

I can also indicate to you that there was no personal representation by me within the seven-year period, al-

though I must indicate—and I am doing this from handwriting on the orders of the proceedings that are within these files—I should also indicate to you that I was a named partner of that firm and everything that had to do with that firm's representation of the FDIC at all times was under my direct supervision. There was no other partner of that law firm that was charged with the responsibility of supervising the FDIC case assigned to that firm at any time.

MR. CHALFEN [counsel for FDIC]: You did not personally appear in court?

THE COURT: Within the seven-year period, to the best of my knowledge, no, but I want to make it clear. Every lawyer who did appear in that court for that law firm within that seven-period would have done so under my direct supervision.

MR. CHALFEN: May I also clarify what your Honor indicated, I believe at the commencement of the trial that you never personally represented the FDIC in its corporate capacity?

THE COURT: No. I represented it only in its capacity as liquidator or receiver of the Gateway National Bank of Chicago ***."

After a hearing on the post-trial motion, the circuit court held that Rule 63(C)(1)(c) was not violated. The judge concluded that the FDIC in its corporate capacity is a different "party," within the meaning of Rule 63(C)(1)(c), than the FDIC acting in its receivership capacity. Because the judge had not represented the FDIC in its corporate capacity, Rule 63(C)(1)(c) was not violated.

On appeal, the appellate court questioned the circuit court's reasoning. A majority of the appellate court, however, affirmed the circuit court on a different ground. Because the circuit court judge had only exercised a limited supervisory role in the three previous FDIC cases, the majority concluded that the judge had not "represented" the FDIC within the meaning of Rule 63(C)(1)(c).

We do not reach the issues decided by the lower courts. We can affirm the decision below on any ground supported by the record. Under the facts of this case, we find that the circuit court judge disclosed the basis for disqualification before trial and that O'Malley had an opportunity to inquire further. By failing to do so, O'Malley has forfeited his right to raise the issue at this time.

In this case, the circuit court judge disclosed his representation of the FDIC at an early stage. He also stated that his representation of the FDIC was in connection with the liquidation of Gateway National Bank. O'Malley, however, did not pursue the matter further until an unfavorable judgment was entered against him.

In this appeal, O'Malley argues that disqualification can only be waived by written remittal. We disagree. The purpose of Rule 63(C)(1)(c) is to disqualify a judge from further proceedings where that judge may be biased because of his earlier representation of a party. The rule contemplates that the basis for disqualification will be disclosed at an early stage. It is then possible to obtain a substitute judge. Alternatively, the parties and attorneys may sign a remittal, free from the judge's coercion, and agree to let the judge proceed.

In this case, O'Malley seeks to use the rule differently. O'Malley does not seek prospective recusal of the judge; he seeks nullification of the trial. Before O'Malley can seek a new trial, he must show that he did not know the reason for disqualification or have a reason to know. Other courts have adopted similar reasoning. (See, *e.g.*, *United States v. Murphy* (7th Cir. 1985), 768 F.2d 1518; *Sacramento & San Joaquin Drainage District v. Jarvis* (1959), 52 Cal. 2d 799, 336 P.2d 530; *Haire v. Cook* (1976), 237 Ga. 639, 229 S.E.2d 436; *Renforth v. Fayette Memorial Hospital Association, Inc.* (1979), 178 Ind. App. 475, 383 N.E.2d 368; *Citizens First National Bank v. Hoyt* (Iowa 1980), 297 N.W.2d 329.) To hold

otherwise would permit a party to await the outcome of a trial and object only when the outcome is unfavorable.

O'Malley suggests that *Woods v. Durkin* (1989), 183 Ill. App. 3d 870, requires a different result. In *Woods*, before trial, the circuit court judge told the parties that his daughter-in-law was an associate in the law firm representing the defendant. The judge told the attorneys that, under the rules, the parties and attorneys would have to execute a signed waiver before he could proceed. The judge, however, obtained an oral waiver of disqualification from the attorneys and then entered an order relating to discovery. The plaintiffs brought a motion to vacate the order because the parties and attorneys had not completed a written remittal. The judge vacated the discovery order and said that he would hear no more motions until a written remittal was completed. On appeal, the appellate court held that the circuit court judge had no discretion to obtain an oral waiver rather than a written remittal. Thus, the attorneys' oral waiver of the disqualification was not sufficient and the discovery order was invalid.

We find no conflict between our reasoning in this case and the appellate court's reasoning in *Woods*. In *Woods*, the plaintiffs knew the reason for disqualification and promptly raised the issue of a written remittal before trial. Here, before trial, O'Malley knew the judge had represented the FDIC previously although O'Malley did not know how recent the representation was. O'Malley waited until after trial before determining when the representation occurred. He then argued that the judge should have obtained a written remittal.

We emphasize that judges may not ignore the written remittal requirement and obtain an oral waiver instead of a written one. Where a judge has disclosed his disqualification, he must obtain a written remittal before continuing. Parties, however, must exercise due

diligence before they can use the written remittal requirement as the basis for a new trial.

We note that the result could be different in this case if actual prejudice were shown. O'Malley, however, has not shown actual prejudice from the judge's prior involvement with the FDIC, and we find no indication of prejudice from the record. Prejudice is not shown from the mere fact that O'Malley lost at trial. Thus, we will not excuse O'Malley's failure to raise the written remittal requirement earlier.

## IV. Section 1823(e)

O'Malley next argues that the lower courts misapplied section 1823(e). In the circuit and appellate courts, the FDIC successfully invoked section 1823(e) to prevent O'Malley from arguing that the guarantee was legally insufficient or had been extinguished. Whether section 1823(e) applies in this case is a question of law, which we review *de novo. Federal Deposit Insurance Corp. v. Wright* (7th Cir. 1991), 942 F.2d 1089, 1097.

Section 1823(e) is based on the doctrine first announced in *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676. In *D'Oench,* the FDIC sued to enforce promissory notes signed by the defendant and found among bank files. The defendant had an agreement with the bank that he would not receive any proceeds from the notes. In return, the bank agreed not to enforce the notes against the defendant. The purpose of this arrangement was to inflate the apparent value of the bank's assets, thus deceiving bank regulators.

The Supreme Court held that the defendant was barred from asserting this arrangement with the bank. The Court discussed the circumstances under which such arrangements would be barred:

"The test is whether the note was designed to deceive the creditors or the public authority, or *would tend to have*

*that effect.* It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." (Emphasis added.) (*D'Oench,* 315 U.S. at 460, 86 L. Ed. at 963-64, 62 S. Ct. at 681.)

Thus, the Court held that such arrangements would be invalid against the FDIC even if a defendant did not intend to deceive the FDIC.

In 1950, Congress enacted 12 U.S.C. § 1823(e). This Federal statute provides:

"No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and any person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank." (12 U.S.C. § 1823(e) (1988).)

An agreement that fails to meet all four requirements is barred. (*Federal Deposit Insurance Corp. v. Manatt* (8th Cir. 1991), 922 F.2d 486, 488; *Wright,* 942 F.2d at 1101.) Agreements that would ordinarily be valid under State law are invalid against the FDIC unless they meet the statutory requirements. *Federal Deposit Insurance Corp. v. Powers* (N.D. Ill. 1983), 576 F. Supp. 1167, 1169, *aff'd* (7th Cir. 1984), 753 F.2d 1076.

The Supreme Court has construed section 1823(e) narrowly. (*Langley v. Federal Deposit Insurance Corp.* (1987), 484 U.S. 86, 98 L. Ed. 2d 340, 108 S. Ct. 396.) In *Langley,* the FDIC sued to enforce notes signed by the defendants. The Court held that section 1823(e) precluded the defendants from arguing that a bank's fraud-

ulent misrepresentations induced them to sign the notes. The Court adopted a strict construction of the statute and discussed the reasons for the statutory requirements:

"One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities [citation], and when the FDIC is deciding whether to liquidate a failed bank [citation], or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank [citation]. The last kind of evaluation, in particular, must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.' [Citation.] Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

A second purpose of § 1823(e) is implicit in its requirement that the 'agreement' not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record 'contemporaneously' with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

\* \* \*

\*\*\* Petitioners are really urging us to engraft an equitable exception upon the plain terms of the statute. Even if we had the power to do so, the equities petitioners invoke are not the equities the statute regards as predominant. While the borrower who has relied upon an erroneous or even fraudulent unrecorded representation has some claim to consideration, so do those who are harmed by his failure to protect himself by assuring that

his agreement is approved and recorded in accordance with the statute. \*\*\*

The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e)."
*Langley*, 484 U.S. at 91-95, 98 L. Ed. 2d at 347-49, 108 S. Ct. at 401-03.

## V. Application of Section 1823(e)

In this case, O'Malley seeks to avoid application of section 1823(e) entirely. He examines the language of section 1823(e) and argues that the FDIC must first acquire an asset before the statute applies. According to O'Malley, the FDIC has the burden of establishing the existence of an asset before it can invoke the statute. O'Malley presents three separate "no-asset" arguments.

### A. *Legal Sufficiency of the Guarantee*

O'Malley first argues that the guarantee never formed part of the Dine loan transaction. He argues that he left the guarantee with Bekta, to be used only if Dine could not get the loan otherwise. In support of his argument, O'Malley relies on bank records that do not refer to a guarantee. O'Malley contends that it was insufficient for the FDIC to merely show that a document called a "guarantee" existed in the bank files.

As the appellate court noted, O'Malley's argument is very similar to an argument rejected in *Powers*, 576 F. Supp. 1167. In *Powers*, the FDIC sued to enforce a guarantee. Although Powers acknowledged signing the guarantee, he argued that he had never agreed to let the bank use the guarantee. When Powers signed the document, he left the remainder of the document blank, to be completed later. The FDIC later found the guarantee among the bank's files. Powers introduced affidavits to prove that the guarantee was not executed in connection with the underlying loan. The court, however, barred Powers' defenses under section 1823(e), finding that Powers relied on an unwritten understanding to undermine a facially sufficient guarantee.

Other courts have barred unwritten understandings arising under similar circumstances. See, *e.g., Wright*, 942 F.2d 1089 (note maker was barred from asserting that notes found in bank files were not intended to be used until bank approved a line of credit); *Federal Deposit Insurance Corp. v. McClanahan* (5th Cir. 1986), 795 F.2d 512 (the defendant "recklessly" signed a document in blank and thereby lent himself to a scheme that permitted the misrepresentation of assets); *Adams v. Madison Realty & Development, Inc.* (3d Cir. 1991), 937 F.2d 845 (investors who signed unconditional promissory notes could not raise fraud in the inducement as a defense); *Federal Deposit Insurance Corp. v. Gardner* (S.D. Miss. 1985), 606 F. Supp. 1484 (note maker could not assert agreement between bank president and note maker that bank would look solely to a third party for payment of the note).

Ultimately, O'Malley's argument is based on an understanding between O'Malley and Bekta that the guarantee would only be used if Dine could not get the loan on his own. O'Malley signed the guarantee, he left it with a bank director, the FDIC found the guarantee in the files, and O'Malley now argues that the guarantee would not be used unless certain circumstances arose. O'Malley's argument is based on the existence of an unwritten understanding that does not meet the statutory requirements. Once the FDIC found the guarantee in the bank records, it did not have to disregard the facially sufficient guarantee simply because other bank records did not refer to it. See *Bowen v. Federal Deposit Insurance Corp.* (5th Cir. 1990), 915 F.2d 1013, 1016 (the FDIC "has no duty to compile oral histories of the bank's customers and loan officers" and need not "retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes"); *Armstrong v. Resolution Trust Corp.* (1993), 157 Ill. 2d 49 (the borrowers could

not avoid section 1823(e) by inferences drawn from bank records); see also *Federal Deposit Insurance Corp. v. O'Neil* (7th Cir. 1987), 809 F.2d 350, 353-54; *Federal Deposit Insurance Corp. v. Zook Brothers Construction Co.* (9th Cir. 1992), 973 F.2d 1448, 1453; *Beighley v. Federal Deposit Insurance Corp.* (5th Cir. 1989), 868 F.2d 776, 783-84.

## B. *Release*

O'Malley next argues that he had a release agreement with the Bank that extinguished the guarantee. According to O'Malley, O'Malley and the Bank agreed to end their working relationship in 1979 and exchanged mutual letters of release. The circuit court found that this release agreement did not meet the requirements of section 1823(e). Specifically, the purported release agreement was not approved by the board of directors or loan committee of the Bank. O'Malley argues that the statutory requirements do not apply to the release agreement. According to O'Malley, section 1823(e) does not bar agreements showing that the FDIC never acquired an asset.

Federal courts have rejected O'Malley's argument. (*Federal Deposit Insurance Corp. v. P.L.M. International, Inc.* (1st Cir. 1987), 834 F.2d 248, 252; *Wright*, 942 F.2d at 1100-01; *Federal Deposit Insurance Corp. v. Merchants National Bank* (11th Cir. 1984), 725 F.2d 634, 639; *Zook*, 973 F.2d at 1452-53; *Federal Deposit Insurance Corp. v. Waldron* (D.S.C. 1979), 472 F. Supp. 21, 25 (this "no-asset" argument is "circular" because it requires a defendant to rely on an agreement, barred by the statute, to show that no asset exists); *Federal Deposit Insurance Corp. v. Cover* (D. Kan. 1988), 714 F. Supp. 455 (an asset shown in the records of the bank remains an asset for purposes of section 1823(e) until the defendants show payment or introduce an agreement meeting the requirements of section 1823(e)).) Section 1823(e) allows

the FDIC to rely on facially unqualified instruments contained in bank records. Agreements that defeat these facially unqualified instruments must meet the statutory requirements. To allow O'Malley's defense would render the protection of the statute meaningless. *Merchants*, 725 F.2d at 639.

O'Malley relies on *Commerce Federal Savings Bank v. Federal Deposit Insurance Corp.* (6th Cir. 1989), 872 F.2d 1240, and *Federal Deposit Insurance Corp. v. Prann* (D.P.R. 1988), 694 F. Supp. 1027, *aff'd sub nom. Federal Deposit Insurance Corp. v. Bracero & Rivera* (1st Cir. 1990), 895 F.2d 824, to support his "no-asset" argument. In those cases, however, the courts found that the underlying debts had been paid. Section 1823(e) does not apply where "the parties contend that no asset exists *** *and* that such invalidity is caused by acts independent of any understanding or side agreement." (Emphasis in original.) (*Merchants*, 725 F.2d at 639.) A party asserting payment as a defense is not relying on a separate agreement to prove the asset invalid. (*Federal Deposit Insurance Corp. v. Bracero & Rivera* (1st Cir. 1990), 895 F.2d 824, 830.) In contrast, O'Malley's release defense is based on an agreement between O'Malley and the Bank.

Federal courts have applied section 1823(e) to bar individuals from asserting release agreements. In *P.L.M.*, 834 F.2d at 252, the court rejected an argument based on similar facts. In that case, the defendants signed a continuing guarantee in favor of the bank. The defendants later obtained a release from the bank, but the guarantee remained in an active collateral file with no notation of cancellation. The FDIC sued to enforce the guarantee, and the defendants offered the release agreement to show that the guarantee had been extinguished before the FDIC took control. The court barred the use of this release agreement because it failed to

meet the requirements of section 1823(e). See also *Federal Deposit Insurance Corp. v. Rivera-Arroyo* (1st Cir. 1990), 907 F.2d 1233 (written release agreements did not meet requirements of section 1823(e) and were therefore barred); *Manatt*, 922 F.2d 486 (the defendant, who had been a stockholder and lawyer for a bank, was barred from asserting an agreement where the notes were in the bank's files and bore no notation of cancellation); *Resolution Trust Corp. v. McCrory* (5th Cir. 1992), 951 F.2d 68 (the defendants could not assert a letter agreement of release even though bank officers testified that they had executed the agreement, two documents in the bank's official files referred to the agreement, and the agreement was kept in the files of the bank's outside attorney); *Federal Deposit Insurance Corp. v. Krause* (8th Cir. 1990), 904 F.2d 463 (the defendants could not assert a settlement agreement with the bank president because the notes were located in the bank's active files, bore no "paid" notation, and the bank's minutes did not reflect approval of this agreement); see also *Federal Deposit Insurance Corp. v. Allen* (6th Cir. 1986), 801 F.2d 863 (written agreement located in the bank's loan file was barred because it did not satisfy all of the statutory requirements).

O'Malley also relies on *Federal Deposit Insurance Corp. v. Nemecek* (D. Kan. 1986), 641 F. Supp. 740, to support his "no-asset" argument. In *Nemecek*, the court allowed the defendants to introduce an oral accord and satisfaction against the FDIC. In that case, the court held that an oral accord and satisfaction extinguished a note before the FDIC took control of a bank, so section 1823(e) did not apply. O'Malley argues that the same reasoning should apply to his release agreement.

We note that the reasoning in *Nemecek* has been criticized by other courts. (*Federal Deposit Insurance Corp. v. National Consumer Alliance, Inc.* (D. Kan. 1994),

1994 WL 326064 (noting that *Nemecek* was decided before the Supreme Court's narrow construction of section 1823(e) in *Langley*); *Cimarron Federal Savings & Loan Association v. McKnight* (Okla. App. 1992), 840 P.2d 648; *Cover*, 714 F. Supp. 455.) In *Cover*, the court stated that to adopt the logic of *Nemecek* "would destroy the effect and protection of § 1823(e) and hamper the FDIC's ability to follow the purchase and assumption alternative by injecting uncertainty into the valuation of assets." (*Cover*, 714 F. Supp. at 458.) In addition, the *Nemecek* reasoning is inconsistent with the reasoning of other courts that have addressed O'Malley's "no-asset" argument. We therefore decline to follow *Nemecek*.

## C. *Cancellation*

O'Malley next argues that his release defense arises from the instrument the FDIC seeks to enforce. The guarantee explicitly gave the Bank the right to release O'Malley from his obligation. In some instances, Federal courts have held that section 1823(e) does not apply where a defense arises from the instrument the FDIC seeks to enforce.

O'Malley relies on *Howell v. Continental Credit Corp.* (7th Cir. 1981), 655 F.2d 743, and *Riverside Park Realty Co. v. Federal Deposit Insurance Corp.* (M.D. Tenn. 1978), 465 F. Supp. 305, in support of his position. In *Howell*, Continental Credit Corporation (Continental) and Howell entered into several lease agreements, which imposed obligations on both parties. Continental subsequently breached the agreements. The FDIC later took control of Continental and sought to enforce the leases against Howell. The Seventh Circuit held that the FDIC could not ignore the terms contained on the face of the leases. The court distinguished earlier cases involving "a facially valid note or guarantee imposing a unilateral obligation" to pay. *Howell*, 655 F.2d at 746.

In *Riverside*, the FDIC sought to foreclose a deed of

trust that specifically incorporated the terms of a loan agreement by reference. Again, the court did not invoke section 1823(e) because the terms of the loan agreement appeared on the deed of trust that the FDIC was trying to enforce. Riverside was therefore allowed to raise breach of the loan agreement as a defense. The court found that section 1823(e) did not apply because "the asset upon which the FDIC is attempting to recover is *the very same agreement* that the makers allege has been breached." (Emphasis in original.) *Riverside*, 465 F. Supp. at 313.

In both cases, the court held that the FDIC could not selectively seek to enforce an agreement. The FDIC could not enforce some terms and ignore others that appeared in the same agreement. Here, in contrast, the guarantee did not contain terms that imposed responsibilities on the Bank. The guarantee provided only for the bare possibility that the Bank might issue a release at some point in the future. Thus, the FDIC would not know from a review of the guarantee that such a release existed. (See *Federal Deposit Insurance Corp. v. Venture Contractors, Inc.* (7th Cir. 1987), 825 F.2d 143, 149-50 (refusing to apply *Howell* to a continuing guarantee that imposed a unilateral obligation to pay); *O'Neil*, 809 F.2d at 354 (refusing to apply *Howell* because the note merely referred to a side agreement and did not contain the terms of the side agreement).) In this case, O'Malley relies on a separate release agreement to extinguish the guarantee.

In a related argument, O'Malley contends that the guarantee provides him with the unilateral right to cancel by giving written notice to the Bank. He again argues that this defense arises from the language of the guarantee and is therefore not barred by section 1823(e). O'Malley relies on *Federal Deposit Insurance Corp. v. Panelfab Puerto Rico, Inc.* (1st Cir. 1984), 739 F.2d 26. In

*Panelfab*, the court allowed the defendants to introduce a letter of cancellation because the letter was not part of a separate agreement between the bank and the defendants. But see *O'Neil*, 809 F.2d 350; *P.L.M.*, 834 F.2d 248; *Federal Deposit Insurance Corp. v. Virginia Crossings Partnership* (8th Cir. 1990), 909 F.2d 306 (cancellation letter barred by section 1823(e)).

Even assuming that section 1823(e) does not apply to this written notice of cancellation, we find that O'Malley never executed a written notice satisfying the terms of the guarantee. The guarantee specifically requires written notice by O'Malley for cancellation. The circuit court found that no evidence had been introduced to show that O'Malley had invoked his right to cancel by written notice. The only written document to the Bank offered by O'Malley was a copy of a letter he purportedly sent to the Bank. The letter purported to release the Bank from its obligations; it did not refer to any obligations O'Malley owed to the Bank. Thus, even if section 1823(e) allows evidence of cancellation by written notice, O'Malley has not shown that he gave written notice.

VI. Constitutionality of Section 1823(e)

O'Malley argues that the lower courts erred in requiring strict compliance with section 1823(e). He contends that those courts should have required only substantial compliance. We find this argument contrary to established law.

O'Malley argues that the release substantially complied with section 1823(e). In this case, the circuit court found that the purported release was not approved by the Bank's board of directors or loan committee and was not reflected in the minutes. O'Malley argues that it should be enough that Geary's authority to issue the release is part of the board minutes. This specific argument has been rejected. *Gardner*, 606 F. Supp. 1484

.

(agreement between bank president and note makers was not valid because the agreement was not specifically approved by the board of directors or the loan committee even though the president had the authority to make such an agreement).

In addition, the Supreme Court has emphasized that courts must strictly construe the statute. (*Langley*, 484 U.S. at 95, 98 L. Ed. 2d at 349, 108 S. Ct. at 403.) The equities favor the FDIC and depositors, and Congress has erred on the side of certainty. (*Langley*, 484 U.S. at 94-95, 98 L. Ed. 2d at 349, 108 S. Ct. at 403; see also *Wright*, 942 F.2d at 1101; *Federal Deposit Insurance Corp. v. Caporale* (1st Cir. 1991), 931 F.2d 1, 2 ("As among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded").) As the appellate court noted, we are not at liberty to rewrite the plain terms of the statute.

O'Malley next contends that section 1823(e), if literally applied, is unconstitutional. O'Malley argues that the statute violates due process, equal protection, and impairs contractual rights. O'Malley, however, provides little support for these arguments and little authority for his reasoning. Courts have consistently rejected similar arguments. *Chatham Ventures, Inc. v. Federal Deposit Insurance Corp.* (5th Cir. 1981), 651 F.2d 355, 362-63; *Beighley v. Federal Deposit Insurance Corp.* (N.D. Tex. 1987), 676 F. Supp. 130, 132-33; *Resolution Trust Corp. v. Dadonna* (3d Cir. 1993), 9 F.3d 312, 320-21; *Campbell Leasing, Inc. v. Federal Deposit Insurance Corp.* (5th Cir. 1990), 901 F.2d 1244, 1248; see generally S. Lake, *Banking Law: The D'Oench Doctrine and 12 U.S.C. § 1823(e): Overextended, but Not Unconstitutional*, 43 Okla. L. Rev. 315 (1990) (discussing constitutional challenges based on taking of property without just

compensation, procedural and substantive due process, and right to trial by jury).

VII. Other Issues

In addition to the three issues discussed above, O'Malley has raised the following issues: (4) whether the sale of the Dine notes to La Salle discharged O'Malley; (5) whether the Bank's continued extensions of credit to Dine discharged O'Malley; (6) whether an alleged settlement between Bekta and the FDIC entitled O'Malley to a setoff; (7) whether the FDIC's alleged release of Bekta operated to partially release O'Malley; and (8) whether the appellate court awarded the appropriate amount of interest to the FDIC. The FDIC argues that these issues have been waived because they were not raised in the petition for leave to appeal. Under Rule 315(b)(3), a petition for leave to appeal shall state "the points relied on for reversal of the judgment of the Appellate Court." (134 Ill. 2d R. 315(b)(3).) A party's failure to raise an argument in the petition for leave to appeal may be deemed a waiver of that argument. (*Dineen v. City of Chicago* (1988), 125 Ill. 2d 248, 265-66.) Accordingly, we find these additional issues waived and decline to address them.

Finally, we note that the FDIC has cross-appealed the appellate court's award of interest. An examination of the guarantee shows that it fails to specify an interest rate. The circuit court concluded that O'Malley and the Bank intended for the rate in the underlying note to apply to the guarantee. At trial, the FDIC produced testimony concerning the interest rate used in the note. This interest rate was related to Continental Bank's prime rate. The circuit court found that the FDIC testimony failed to disclose the actual rates used, or the source of these rates. The circuit court, however, found that interest could be supported by other evidence produced at trial. The trial balance of the Bank on April

28, 1983, which showed the total interest due on Dine's notes, had been introduced as a business record. The circuit court therefore based its interest calculation on this balance. It did not award any interest after April 28 because the FDIC failed to prove the interest due under the guarantee. The appellate court agreed with the procedure used but found that the calculation was incorrect. It therefore modified the amount of interest awarded. After reviewing the record, we find no error in the appellate court's award of interest.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

CHIEF JUSTICE BILANDIC, dissenting:

The majority opinion is fatally flawed by its erroneous application of section 1823(e) to the facts of this case. O'Malley's guarantee was discharged by mutual releases exchanged between O'Malley and the Bank. The FDIC has no authority to enforce a nonexistent guarantee. For this reason, I respectfully dissent.

Section 1823(e) provides that the rights and interests of the FDIC in assets acquired from a bank pursuant to its statutory duties cannot be diminished or defeated by agreements that do not meet certain requirements. (12 U.S.C. § 1823(e) (1988).) This section was enacted to protect the FDIC from secret agreements, and deceptive schemes or arrangements, between a bank and an obligor, which tend to misrepresent a bank's assets and ultimately mislead the FDIC. See *Langley v. Federal Deposit Insurance Corp.* (1987), 484 U.S. 86, 92-93, 98 L. Ed. 2d 340, 347-48, 108 S. Ct 396, 401-02; *Commerce Federal Savings Bank v. Federal Deposit Insurance Corp.* (6th Cir. 1989), 872 F.2d 1240, 1245; *Armstrong v. Resolution Trust Corp.* (1993), 157 Ill. 2d 49, 61-62.

Section 1823(e), by its own terms, is not applicable under the facts of this case. Section 1823(e) applies only

to assets acquired by the FDIC in a takeover. It does not apply to situations where no asset exists because it has been extinguished prior to the FDIC's takeover of the bank. See *Commerce Federal Savings Bank v. Federal Deposit Insurance Corp.* (6th Cir. 1989), 872 F.2d 1240; *Federal Deposit Insurance Corp. v. Prann* (D.P.R. 1988), 694 F. Supp. 1027, *aff'd* (1st Cir. 1990), 895 F.2d 824.

In this case, the guarantee that O'Malley executed in 1975 did not exist and thus was not an asset of the Bank at the time the FDIC acquired the Bank's assets. Approximately four years before the FDIC took over the Bank, O'Malley received a written release from the Bank, signed by its president, which released O'Malley from all obligations owed to the Bank. In consideration for this release, O'Malley released the Bank from any obligations it owed to him. Section 1823(e) does not apply to the facts here because O'Malley's release was not a secret agreement designed to deprive the FDIC of an otherwise valid asset. Rather, the release demonstrates that the guarantee was not an asset of the Bank at the time the FDIC took over the Bank. Thus, the majority incorrectly applies section 1823(e) in this case to prevent an innocent party from asserting a valid release.

Several courts have recognized that section 1823(e) does not apply under circumstances such as those at issue here.

In *Commerce*, a deed of trust was executed as security for a loan. The deed of trust contained a clause covering future debts. The balance of the loan was subsequently paid, and the bank orally agreed to release the deed of trust. Meanwhile the bank failed and the FDIC was appointed as receiver of its assets. The FDIC acquired various assets of the failed bank, including the deed of trust and a second promissory note. The FDIC refused to release the deed of trust, contending that the second promissory note was secured by the deed of trust.

The FDIC argued that the oral agreement to release the deed was barred by section 1823(e). The Sixth Circuit rejected the FDIC's position and held that the deed of trust was not an asset acquired by the FDIC. (*Commerce*, 872 F.2d at 1246.) The court concluded that the original loan had been satisfied before the FDIC's involvement and that the oral agreement to release the trust deed was enforceable and not barred by section 1823(e). *Commerce*, 872 F.2d at 1246.

Similarly, in *Prann*, the FDIC sought to recover on a promissory note. The court held that section 1823(e) was not applicable because the debt underlying the note was satisfied before the FDIC acquired the bank's assets. (*Prann*, 694 F. Supp. at 1037.) Consequently, the note was not an asset protected by section 1823(e).

The majority opinion attempts to distinguish *Commerce* and *Prann* by pointing out that the underlying debts had been paid, whereas in the instant case O'Malley relies on a release. The majority fails to comprehend that an obligation can be discharged in a number of ways, including obtaining a valid release. Consequently, the fact that the methods of discharge differed in those cases and the instant case is insignificant. Nonetheless, it is significant that full payment in *Commerce* and *Prann* and full release of O'Malley in the instant case both occurred prior to the FDIC's acquisition of any assets. By discharging the release prior to the FDIC's takeover of the Bank, the guarantee did not exist as an asset.

For the reasons stated, the FDIC had no authority to consider the guarantee as an asset of the Bank. Since it was not an asset of the Bank, it could not be enforced against O'Malley. Accordingly, I dissent from the majority's decision.

JUSTICE HARRISON, also dissenting:

The circuit judge admitted that he represented the

FDIC within seven years of the commencement of trial. Under the clear and unambiguous language of Rule 63(C)(1)(c) (113 Ill. 2d R. 63(C)(1)(c)), the judge could not sit on the case and was required to disqualify himself. (See *Woods v. Durkin* (1989), 183 Ill. App. 3d 870, 874.) Although Rule 63(D) (113 Ill. 2d R. 63(D)) has a provision for remittal of disqualification, there is no dispute that the requirements of that provision were not satisfied here. O'Malley is therefore entitled to a new trial.

The majority denies this relief on the theory that O'Malley failed to exercise due diligence. Such a position is untenable as a matter of law. Under the system we have fashioned, the burden of insuring compliance with the rules governing disqualification lies with the judge, not the litigants. If a judge is disqualified under Rule 63(C)(1)(c), he must remove himself from the case. The matter is not discretionary, and does not depend on action by the parties. Judges are expected to recognize on their own when they should refrain from hearing a case. It could not be otherwise, for often the judge will be the only one in the courtroom who knows of the facts that disqualify him.

The terms of our disqualification rules are clear and absolute. Once disqualified, a judge remains disqualified unless the requirements of the remittal provision are satisfied. (See *Woods*, 183 Ill. App. 3d at 874.) There are no exceptions, and the rule is not subject to waiver by oral agreement of counsel. (See *Woods*, 183 Ill. App. 3d at 875.) If the judge wants to hear the case, it is up to him to obtain the necessary written agreement. (113 Ill. 2d R. 63(D).) The rule provides that he may ask the parties and their attorneys to consider waiver of disqualification. It does not obligate the parties or their attorneys to ask that he ask or to otherwise police his judicial responsibilities.

The majority's position must also fail on the facts. O'Malley could not have pursued the matter of disqualification sooner because he did not know about it. As the appellate court noted, O'Malley was not in court when the judge disclosed his representation of the FDIC, and O'Malley's attorney never discussed waiver of any conflict of interest with him. (249 Ill. App. 3d at 361.) That O'Malley's attorney knew of the judge's connection to the opposing party is of no consequence. Under the express terms of Rule 63(D), agreement of counsel is insufficient. The parties themselves must agree to remittal of the disqualification in order for it to be effective. O'Malley did not so agree. The circuit judge was therefore prohibited from hearing the case. Accordingly, I dissent.