972 P.2d 161 (1999)
ALASKA SOUTHERN PARTNERS, Appellant,
v.
William C. PROSSER, Robert A. Prosser, and Richard L. Besse, Appellees.
No. S-7795.
Supreme Court of Alaska.
January 22, 1999.
*162 Calvin R. Jones, Hoge & Lekisch, Anchorage, for Appellant.
William L. Choquette, Artus & Choquette, P.C., Anchorage, for Appellees.
Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE and BRYNER, Justices.

OPINION
PER CURIAM.
When the Federal Deposit Insurance Corporation (FDIC) became receiver for the failing Alliance Bank, the bank's loan files showed that Huffman Hills Development Company (HHDC) owed it money. Alaska Southern Partners, acting as the FDIC's successor, sued to collect the loan. In defense, HHDC successfully asserted that the bank had accepted an assignment of certain third-party notes to satisfy the loan, but had never fully credited this assignment in its loan files. Does 12 U.S.C. § 1823(e)(1)  a law that invalidates agreements tending to diminish the FDIC's acquired interest in any "asset" documented in a failing bank's files  preclude HHDC's defense? We find no preclusion, because HHDC's payment in full left no asset for the FDIC to acquire.

I. FACTS AND PROCEEDINGS

Although the parties dispute the legal significance of  and to some extent the reasonable inferences arising from  the evidence contained in the record, they do not dispute the basic facts. On August 25, 1986, William C. Prosser, Robert A. Prosser, and Richard L. Besse, acting collectively as HHDC, signed a loan note (Note 5744) in the principal amount of $815,000, payable to Alaska Mutual Bank (AMB) in thirty-five monthly installments of $9500 each. To secure Note 5744, HHDC assigned to AMB a security interest in six secured notes that HHDC had received from third parties who had purchased lots in HHDC's developments.
In 1987 HHDC and AMB began negotiating an agreement to repay Note 5744 by an unconditional transfer of five of the third-party notes in which HHDC had given AMB a security interest. According to affidavits submitted by William Prosser of HHDC and Victor Mollozzi, then AMB's Senior Vice President, the arrangement was advantageous to AMB, since the makers of the HHDC notes had better credit than HHDC, and the notes themselves were secured and well seasoned. The principal balances due on four of the five notes were undisputed. But the makers of the fifth note  the Petersons  disputed the amount owing on their note.
It took over a year for AMB and the Petersons to resolve the value of the note. In early 1988, while the amount of the Peterson note remained unresolved, AMB merged with United Bank of Alaska to form Alliance Bank. Victor Mollozzi continued to deal with both HHDC and the Petersons as Alliance's Regional Commercial Loan Officer. In February 1988, the Petersons and Alliance agreed that the remaining balance owing on the Peterson note was $362,000.
Mollozzi's affidavit states that shortly after Alliance reached an understanding with the Petersons as to the outstanding balance on their note, Mollozzi, acting on behalf of Alliance, verbally accepted HHDC's proposal to *163 convey its five notes to Alliance in satisfaction of Note 5744. Mollozzi's assertion of a verbal agreement to accept HHDC's notes is corroborated in the record by a letter from Mollozzi to the Petersons dated March 11, 1988, declaring that Alliance Bank had become the owner of the Peterson note and warning that any future attempt by HHDC to reconvey the note would be invalid. Prosser's affidavit further corroborates Mollozzi's assertion that HHDC transferred ownership of all five notes to Alliance. According to both Prosser and Mollozzi, HHDC and Alliance specifically agreed that HHDC's assignment of the notes would take effect on May 16, 1988; on that date, the unpaid balance on the five notes  which in total exceeded the unpaid balance owing on Note 5744  was to have been credited as payment in full on Note 5744.
Despite this verbal agreement, Alliance never actually credited HHDC with the full amount of the five notes. A letter from Mollozzi to HHDC dated May 17, 1988 (the day after the transferred notes were to be credited as payment), listed only four of the five HHDC notes as having been purchased by Alliance. The letter listed the current unpaid principals on these notes as $428,532.84 and credited this amount against the principal then owing on Note 5744  $767,026.45  "leaving a balance of $338,493.61." The letter did not credit the agreed upon $362,000 owing on the Peterson note; the bank's loan file for Note 5744 also failed to credit the Peterson note.
In his affidavit, Mollozzi could not recall why the bank failed to credit the value of the Peterson note as payment on Note 5744. But the bank's correspondence with the Petersons indicates that, after informing the Petersons in March 1998 that it had acquired their note, the bank began negotiating with them for a discounted early payoff of the note's agreed-upon unpaid balance. By March 15, 1989  ten months after HHDC's agreement with the bank was to have taken effect  the bank's negotiations with the Petersons had culminated in an agreement as to the terms of an early payoff. On that date, Alliance's counsel wrote to HHDC, confirming the bank's intent to credit the value of the Peterson note as satisfaction in full for Note 5744:
By accepting the money from Mr. Peterson, Alliance agrees to release the deed of trust it holds as assignee of Huffman Hills on [the Petersons' lot]. In addition to agreeing to release this particular property from any encumbrance assigned to Alliance Bank, Alliance also agrees that Note No. 5744 signed by Huffman Hills . . . will be considered satisfied in full. (Emphasis added.)
On April 18 and 19, 1989, Alliance actually received the agreed-upon payment from the Petersons  $294,861.43.
Two days later, on April 21, 1989, Alliance failed, and the FDIC was appointed as its receiver. As of that date, the loan file for Note 5744 still reflected no credit for the Peterson note; the outstanding balance on the loan was adjusted to reflect only the four HHDC notes credited a year before, in May 1988.
It is standard practice for the FDIC to review the assets of a failed bank upon being appointed as receiver. Based on its review of Alliance's loan files, the FDIC concluded that Note 5744 was an outstanding asset of Alliance. After counting the Petersons' April 18 and 19 payment of $294,861.43 as a credit against Note 5744's previously shown unpaid balance, the FDIC determined that $77,179 plus interest remained unpaid on the loan; it demanded payment in this amount from HHDC. HHDC did not pay.
Alaska Southern Partners (ASP) subsequently purchased Note 5744 from the FDIC in a bulk sale of loans. In 1994, ASP sued HHDC in superior court to collect $77,178.76 plus interest on Note 5744. HHDC answered that the loan had been paid in full by the transfer of its five notes to Alliance. Both parties filed motions for summary judgment. The court granted summary judgment for HHDC. ASP appeals, claiming that HHDC's motion for summary judgment should have been denied and that its own summary judgment motion should have been granted.

*164 II. DISCUSSION

A. Standard of Review

We review summary judgment decisions de novo,[1] and will uphold an order granting summary judgment only if the record presents no genuine issues of material fact and "the moving party [is] entitled to judgment on the law applicable to the established facts."[2] In conducting our review, we draw all factual inferences in favor of the non-moving party and deny summary judgment when our review reveals a genuine dispute as to any material fact.[3]

B. Summary Judgment in Favor of HHDC Was Appropriate Because Note 5744 Was Fully Satisfied Prior to the FDIC's Taking Over the Bank.

In D'Oench, Duhme & Co. v. FDIC,[4] the United States Supreme Court articulated a doctrine that greatly limits the rights of debtors to defend against collection efforts of the FDIC when it acts in its capacity as receiver of a failed bank.[5] Congress has enacted the substance of the D'Oench, Duhme doctrine as 12 U.S.C. § 1823(e)(1).[6] As set out in this provision, the doctrine invalidates improperly documented agreements that tend to diminish an asset that the FDIC acquires when it takes over a failing bank:
(1) In general

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement 
(A) is in writing,
(B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(D) has been, continuously, from the time of its execution, an official record of the depository institution.
Courts have allowed successors in interest of the FDIC to assert the protections of this statute as well.[7]
By invalidating any improperly documented "agreement which tends to diminish or defeat the interest of [the FDIC] in any asset" it acquires from a failing bank, § 1823(e) greatly limits situations in which a failed bank's debtors can alter the terms and conditions for repayment of the loans reflected in the bank's loan files: because loans are "assets" acquired by the FDIC, the statute nullifies undocumented agreements that could diminish a loan's worth by altering the terms of payment reflected in the bank's loan file. The statute enables the FDIC to rely on a bank's records in evaluating the worth of its assets; it ensures mature consideration of unusual loan transactions; and it prevents fraudulent insertion of new terms into the loan files of a bank that is headed for failure.[8]
But because § 1823(e)(1) only invalidates agreements that tend to diminish or defeat assets in which the FDIC "acquires" *165 an interest, the statute does not preclude a debtor from proving that the FDIC acquired no asset: "The `no asset' exception to D'Oench, Duhme and § 1823(e) is widely recognized."[9] Specifically, a number of courts have recognized that the no asset exception applies when "the [loan] asset had been discharged by the payment and cancellation of the underlying debt before the FDIC obtained the assets of the bank."[10] For purposes of the "no asset" exception, a bank's records need not meet the requirements of § 1823(e)(1).[11] Once "uncontroverted documentation and testimony verify" the fact that payment in full has been made, a rebuttable presumption arises in favor of the paying party, and the FDIC must come forward with evidence to prove that the note has not been paid.[12]
Here, HHDC acknowledges that its agreement to repay Note 5744 by assigning Alliance third-party notes of equivalent value does not meet the requirements of § 1823(e)(1). But HHDC insists that the statute does not govern the agreement. HHDC reasons that because the bank agreed to accept the HHDC notes as payment in full for Note 5744 and HHDC actually transferred them before the FDIC was appointed as receiver of the failing bank's assets, the FDIC simply acquired no asset.
We conclude that HHDC's argument has merit. Ordinarily, a creditor's unconditional acceptance of a third-party note as full payment on a note of equivalent value operates as full payment of the debtor's obligation.[13] Although we have never before determined the effect of a substituted note like the one at issue here, we have previously recognized that if a creditor agrees to and accepts an unconventional form of payment, we should construe it as a payment toward an underlying debt.[14]
In Breaux Bridge Bank & Trust Co. v. Simon,[15] the Louisiana Court of Appeals confronted a situation very similar to the one here. Breaux Bridge Bank and Trust had accepted a loan note valued on its face at $10,647.14 in payment of a $10,000 debt. The FDIC subsequently sued on the original $10,000 note, asserting, under 12 U.S.C. § 1823(e)(1), that the bank's acceptance of the third-party note was not a valid defense against the FDIC.[16] But the court in Breaux declined to apply the statute, holding that the underlying debt had been discharged by the transfer of the third-party note, whose face value the FDIC had not disputed.[17]
Breaux and other authorities recognizing the "no asset" exception persuade us that the superior court correctly granted summary judgment to HHDC. HHDC produced evidence that it transferred five notes to Alliance, which the bank agreed to accept as full payment on Note 5744. The most conclusive evidence of payment is Alliance's March 15, 1989, letter to HHDC unconditionally declaring that the bank considered the *166 Petersons' payment to be full satisfaction for Note 5744. In addition, the affidavits of HHDC's William Prosser and Alliance's Victor Mollozzi confirm that the bank agreed, effective May 16, 1988, to accept HHDC's notes in full satisfaction of Note 5744, and to assign the Peterson note a value of $362,000 for purposes of the transaction. These affidavits are further supported by evidence establishing that HHDC did in fact transfer the five notes  including the Peterson note  to Alliance with the understanding that the bank would accept them as full payment on Note 5744.
The evidence that HHDC presented below to show that the bank accepted the notes as full payment is essentially unrebutted. ASP in effect contends that the bank's failure to credit the Peterson note and its eventual collection of only $294,861.43 from the Petersons suffice to raise issues of fact for trial. But considering the overwhelming nature of the record evidence showing that the bank accepted the five notes as full payment for Note 5744, neither its unexplained failure to credit the Peterson note to the loan file nor its later acceptance of separately negotiated cash payments on that note at less than face value can suffice to raise a genuine issue of material fact as to whether HHDC paid Note 5744 in full.

III. CONCLUSION

Because we find no genuine issues of material fact on the issue of HHDC's payment in full, we AFFIRM the superior court's order granting HHDC summary judgment.
BRYNER, Justice, dissenting.
The case law discussing 12 U.S.C. § 1823(e)(1) seems opaque, making the statute's limits hard to define with confidence. But the statute's primary purpose is clear: it is to ensure that the records of a failing bank permit accurate and immediate appraisal of its assets in the event of FDIC intervention.
The purpose [of § 1823(e)(1) ] is to protect the FDIC from hidden agreements that would defeat its interest in what is otherwise a facially valid note. Such hidden agreements would prevent the FDIC from accurately valuing assets and from making informed decisions on how best to handle a bank's insolvency. The concern is thus with agreements that are not made part of the note.[1]
The statute thus reflects a clear policy choice by Congress to saddle borrowers, rather than depositors or others, with risks generated by inaccuracies and uncertainties in an insolvent bank's loan files:
As among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded.[2]
In light of these statutory purposes, I believe that § 1823(e)(1) precludes a borrower from claiming to have paid off a note  thereby leaving no asset for the FDIC to acquire  if, to prove full payment, the borrower must rely on evidence of an agreement that is neither reflected on the face of the note nor documented in the bank's files in the statutorily prescribed manner. Admittedly, the principal case relied on by the court  Breaux Bridge Bank & Trust Co. v. Simon,[3] reaches a contrary conclusion. But in my view, Breaux is ill-considered and should not be followed, for it too readily allows end runs around § 1823(e)(1)'s basic goals. Federal precedent supports the conclusion that a party can establish a no-asset defense only by "acts independent of any understanding or side agreement."[4] I would follow this precedent.
*167 Here, HHDC's no-asset defense unquestionably relies on proof of a side agreement  the bank's agreement to accept HHDC's third-party notes as full payment for Note 5744  that was undocumented in the loan file. To prevail on its defense, HHDC had to establish that the bank agreed to accept the third-party notes as payment. For purposes of § 1823(e)(1), it is immaterial that this agreement was executed before the bank failed.[5] Because I believe that § 1823(e) precluded HHDC from asserting this side agreement in defense of payment, regardless of how convincingly it might have established the agreement, I would hold that the superior court erred in granting HHDC summary judgment and in denying summary judgment to ASP.
Accordingly, I dissent.
NOTES
[1] Beilgard v. State, 896 P.2d 230, 233 (Alaska 1995).
[2] Wassink v. Hawkins, 763 P.2d 971, 973 (Alaska 1988).
[3] Id.
[4] 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).
[5] Id. at 456-59, 461, 62 S.Ct. 676.
[6] See 12 U.S.C. § 1823(e)(1)(1994); see also FDIC v. McFarland, 33 F.3d 532, 536 (5th Cir. 1994) (discussing relationship between D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e)(1)).
[7] See, e.g., FSLIC v. Cribbs, 918 F.2d 557, 560 (5th Cir.1990); Porras v. Petroplex Sav. Ass'n, 903 F.2d 379, 380-81 (5th Cir.1990); FDIC v. Newhart, 892 F.2d 47, 49-50 (8th Cir.1989).
[8] Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).
[9] McFarland, 33 F.3d at 537.
[10] Id. at 538; see also FDIC v. Bracero & Rivera, Inc., 895 F.2d 824, 829-30 (1st Cir.1990); Commerce Fed. Sav. Bank v. FDIC, 872 F.2d 1240, 1245 (6th Cir.1989); Breaux Bridge Bank & Trust Co. v. Simon, 570 So.2d 156, 157-58 (La.App. 1990); First Heights Bank, FSB v. Gutierrez, 852 S.W.2d 596, 607 (Tex.App.1993).
[11] McFarland, 33 F.3d at 538; see also First Heights Bank, 852 S.W.2d at 607 (holding that "D'Oench and 12 U.S.C. § 1823(e) do not bar proof that a note has been repaid in whole or in part" and asserting that loan records and parol evidence could be used to prove payment).
[12] See Commerce Fed. Sav. Bank, 872 F.2d at 1246.
[13] See, e.g., Berardini v. Hart, 682 P.2d 519, 520-21 (Colo.App.1984); cf. Evinger v. Greeley Gas Co., 902 P.2d 941, 945 (Colo.App.1995) (citing Berardini and J. White & R. Summers, Uniform Commercial Code § 13-20, at 541 (1980), for the proposition that "the tender of a promissory note represents only `conditional payment.' And, such delivery will be deemed as discharging the underlying debt only if the parties thereto so intend."). See generally 60 Am.Jur.2d Payment § 78 (1987).
[14] See Gudenau v. Bierria, 868 P.2d 907, 910 (Alaska 1994) (acceptance by creditor of insurance check payable to debtor and his bank constituted payment).
[15] 570 So.2d 156 (La.App.1990).
[16] Id.
[17] Id. at 157-58.
[1] Commerce Fed. Sav. Bank v. FDIC, 872 F.2d 1240, 1245 (6th Cir.1989) (quoting FDIC v. Hatmaker, 756 F.2d 34, 37 (6th Cir.1985), overruled on other grounds, Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)).
[2] FDIC v. Caporale, 931 F.2d 1, 2 (1st Cir.1991).
[3] 570 So.2d 156 (La.App.1990).
[4] FDIC v. Merchants Nat'l Bank of Mobile, 725 F.2d 634, 639 (11th Cir.1984); FDIC v. Blue Rock Shopping Ctr., Inc., 766 F.2d 744, 753 (3d Cir.1985); see also FDIC v. Leach, 772 F.2d 1262, 1267 (6th Cir.1985); cf. FDIC v. O'Malley, 163 Ill.2d 130, 205 Ill.Dec. 534, 643 N.E.2d 825, 832 (Ill.1994).
[5] Cf. Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).